**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James C. LANE and Dennis R. Lane,
Defendants-Appellants.**

No. 83–1742.

United States Court of Appeals,
Fifth Circuit.

June 18, 1984.

Rehearing and Rehearing En Banc
Denied Aug. 22, 1984.

Clifford W. Brown, Robert Michael Brown, Lubbock, Tex., for defendants-appellants.

James A. Rolfe, U.S. Atty., Fort Worth, Tex., Shirley Baccus-Lobel, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, RUBIN and REAVLEY, Circuit Judges.

GOLDBERG, Circuit Judge:

James C. ("J.C.") Lane and Dennis Lane were indicted in multiple counts for mail fraud, conspiracy, and perjury. J.C. alone was indicted in Count 1 for mail fraud in connection with a 1979 fire at a restaurant in Amarillo, Texas. J.C. and Dennis were both indicted in Counts 2 through 4 for various acts of mail fraud related to a 1980 fire at a duplex in Amarillo. They were also both indicted in Count 5 for conspiring to commit mail fraud in connection with a fire at a Lubbock, Texas flower shop. Dennis alone was indicted in Count 6 for perjury before a Grand Jury. We hold that Count 1 was improperly joined with the other counts pursuant to Fed.Rule Civ. Proc. 8(b). Therefore, we reverse and remand for new trials.

## FACTS

*A. The El Toro Restaurant Fire*

In the summer of 1978, J.C. Lane opened a Mexican restaurant in Amarillo, Texas. J.C., Jimmy Lane, Bill Dale, and Jack Stotts (a cook) were partners in the business. They leased the building for a term of five years and obtained considerable restaurant equipment. The restaurant never operated at a profit, however, and suffered declining gross sales after September, 1978.

In November, J.C. Lane purchased fire insurance on the restaurant from the Transamerica Insurance Group. He insured the contents of the restaurant ($10,000.00) as well as improvements ($10,000.00). He also insured against business losses resulting from the fire ($6,000.00 per month for three months). At about the same time, he contacted Sidney Heard, a professional "torch." Lane hired Heard to burn the building, telling Heard that he wanted to get out of his lease as well as his partnership with the cook.

On February 27, 1979, Heard entered the building and set a fire near the electrical box in the kitchen. The fire did not destroy the building, but the contents suffered smoke damage. After the fire, David Lard, an insurance adjustor for Transamerica, viewed the premises with Lane. Lane showed him where the "electrical" fire had started. The contents portion of the policy was settled for the full amount, $10,000.00. On April 23, 1979, Lard issued a draft for the sum to the El Toro restaurant. On May 3, 1979, he issued a second draft for $9,213.78, covering the "betterments and improvements" portion of the policy.

Finally, on June 1, 1979, Lard mailed a memorandum to officials at Transamerica's regional headquarters in Dallas. He requested their advice on settling El Toro's claim under the "business interruption/loss of earnings" portion of the policy. Included with the memo was a list of monthly income and expenses for the El Toro Restaurant submitted by J.C. Lane. The list claimed a monthly net profit of $2,537.64, reportedly based on average profits between September and December, 1978.[1] This mailing is set forth in Count 1 of the indictment, which charges mail fraud. The claim was settled for $2,699.00; and on November 1, 1979, Lard issued a draft in that amount made out to the El Toro Restaurant.

### B. The Duplex Fire

Sometime in early 1980, J.C. Lane met with Sidney Heard again. Lane advised Heard that he had bought a duplex for $500.00 and was moving it to a vacant lot at 1105 South Jackson Street in Amarillo. Lane offered to hire Heard to burn the building. A few weeks later, Heard, having inspected the property, accepted Lane's offer. Heard recommended that they pile scrap molding inside the building to fuel the flames; and in time, he did move molding into the duplex.

On January 22, 1980, J.C. Lane obtained a $35,000.00 fire policy on the duplex from the Trinity Universal Insurance Company. The policy listed the property as owned by L & L Properties, a partnership composed of Dennis Lane and Andrew Lawson. The duplex policy was added to a preexisting policy for other properties held by the partnership.

Heard instructed his employee, Marvin McFarland, to burn the duplex. Heard was planning a trip to the Bahamas and wanted the fire to take place while he was out of the country. On May 1, 1980, the duplex burned.

Following the fire, William Liles, an adjustor for Trinity Universal, inspected the property; and on May 9, 1980, Liles issued a draft in the amount of $7,000.00 payable to Dennis Lane and Andrew Lawson doing business as L & L Properties.[2] At the same time, Dennis Lane and Lawson signed a Proof of Loss form which stated that the "loss did not originate by any act, design or procurement on the part of your insured or this affiant." *See* Government's Exhibit 34–E. The "Proof of Loss" also stated that "no attempt to deceive [the] company as to the extent of the loss has been made." *Id.* The amount claimed on the Proof of Loss was $7,000.00. On May 15, 1980, Liles mailed to the company's headquarters in Dallas a report on repair costs at the duplex along with the Proof of Loss, photographs, and a repair estimate of about $14,000.00 provided by Dennis Lane.

On May 21 and 30, Liles issued additional drafts to the insured for $2,000.00 and $3,000.00 respectively, as the cost of repairs mounted up. Dennis Lane submitted an additional Proof of Loss corresponding to each payment. These documents made the same representations as the initial Proof of Loss. The record does not reveal when Dennis Lane submitted these additional forms, but Liles mailed the $2,000.00 Proof of Loss to Dallas on May 25, along with a memorandum indicating that the repairs were in progress and had exceeded the initial $7,000.00 advanced. On August 6, he mailed another progress report, the $3,000.00 Proof of Loss, and an additional

---

**1.** Tax records showed that the restaurant actually suffered a loss of $22,258.42 during the period between August and December, 1978. *See* Trial Transcript at 149.

Lane did not attempt to average the "profits" earned during the first two months of 1979. Rather, he reported that all 1979 records were destroyed in the fire. Tax records for that period did survive, however, and show a loss of about $9,000.00 during January and February, 1979.

**2.** The check was also made payable to F.J. Corbin, a mortgagee on the property. Under the policy, Trinity Universal was required to pay the mortgagee as well as the property-owner. *See* Appellee's Brief at 14, n. 1. Apparently, Corbin was not involved in the arson.

Proof of Loss and claim for $2,000.00.[3] The $7,000.00 Proof of Loss and report mailed on May 15 are the subject of Count 2; the two Proofs of Loss and the memo mailed on August 6 are the subject of Count 3.

On September 16, 1980, Liles issued yet another draft, this one for $12,250.00, representing final settlement of the claims and bringing the total amount paid to $24,250.00. On September 18, Liles mailed a memorandum to Dallas explaining the high total cost of restoration. He enclosed a number of invoices supplied by Dennis Lane. Again, it is not clear when Dennis had delivered the documents. The invoices listed various materials and furniture (e.g. mahogany trim, plywood, door jambs, a bathtub) purportedly bought by L & L Properties to repair and refurbish the duplex. In truth, the invoices had been fabricated by J.C. Lane, Sidney Heard, and Heard's secretary. These invoices and Liles's memorandum form the basis for Count 4.

## C. The Lubbock Flower Shop Conspiracy

Several weeks after the duplex fire, Sidney Heard visited J.C. Lane's office to collect his payment. J.C., Dennis Lane, and Andrew Lawson were present; and the men began to discuss the duplex. Heard indicated that he did not want to talk in front of Lawson, but Dennis assured him that Lawson was "all right ... he's my partner and he knows what's going on." Trial Transcript at 252. Heard then told them that he was thinking of going into the flower shop business if they were interested. If they would put up $5,000.00 and cover the rent and insurance on the building, he would take care of the "torch," and a man he knew would supply flowers to outfit the shop. He wanted to set up the shop in Lubbock. Dennis and J.C. liked the

idea; and J.C. told Heard to contact them when he had picked out a building.[4]

After the meeting, Heard contacted William Lankford who already ran an artificial flower business in Amarillo (L & L Designs). Lankford agreed to stock the proposed Lubbock shop with old flowers and broomweed. Lankford and Heard planned to insure the contents of the shop for about $50,000.00. They would split $20,000.00 of the proceeds. This cut would be reflected by a note payable to Lankford's company from Dennis Lane.

Later, in June, 1980, Heard introduced Lankford to Dennis Lane. Heard and Dennis had come to Lankford's existing flower shop to see how such a business is run and what kind of supplies are necessary. They did not actually discuss the planned arson at the time because other employees were in the shop.

In July, 1980, Heard began looking for a suitable building to rent for the proposed shop. He and Dennis Lane inspected a building at 3602 Avenue A in Lubbock on July 10. Heard felt that it was a good building to burn; and Dennis put down a deposit on the property. He and Heard returned to Amarillo and, before parting, Dennis gave Heard a $5,000.00 check drawn on the L & L Properties account, payable to L & L Designs. He noted on the check that the payment was for the "first shipment of flowers per invoice." *See* Government Exhibit 30.

Around late August, Lankford delivered some cut silk flower arrangements and processed broomweed to the building in Lubbock. Dennis Lane met him there and unloaded the van while Lankford arranged the flowers inside the building. After returning to Amarillo, Lankford prepared an invoice reflecting the cost of the flowers. He also prepared several fictitious invoices as well as a note in the amount of $20,213.70 payable to L & L Designs from Lane's Flower Shop. He gave the phony

---

3. It is not clear from the record whether this claim is the same as that represented by the Proof of Loss mailed on May 25. *See infra* note 10.

4. Lawson said that he was about to move to the Midland-Odessa area and would like to set up a similar arrangement there if the Lubbock deal was successful.

invoices and the note to Sidney Heard who passed them on to Dennis Lane. After Dennis signed the note, Heard kept the original.

In July, 1980, J.C. and Dennis Lane signed a lease for the shop at 3602 A Avenue. Then, in November, J.C. obtained insurance on the shop from the American States Insurance Company. He insured the contents of the shop for $50,000.00. The shop never burned, however. On March 18, 1981, an Amarillo newspaper ran an article connecting Dennis Lane with a scheme to burn the Lubbock flower shop. On the same date, J.C. Lane cancelled the insurance policy.

### D. Dennis Lane's Appearance Before the Grand Jury

On May 12, 1980, Dennis Lane appeared to testify before a Federal Grand Jury in Amarillo. At the time, the Grand Jury was investigating Sidney Heard. Lane testified that after talking to Lankford about the flower business, he decided to open a shop of his own. He chose Lubbock because Amarillo already had a flower shop (Lankford's business, L & L Designs). He said that he paid Lankford $5,000.00 cash to supply the original merchandise. He insured the contents of the store for $50,-000.00 because that is the value of the goods he was supposed to receive ultimately from Lankford. He stated however that he never received the full amount and was not able to open the store as a result.

In the course of questioning, he responded as follows:

Q: Did Mr. Heard have anything to do with this flower shop?

A: No, sir.

Q: Did he have anything to do with your dealings with Lankford?

A: No, sir.

---

5. J.C. was sentenced to five years' imprisonment on Count 1 and a committed fine of $1,000.00. He was sentenced to two years' imprisonment on each of Counts 2 through 4, and committed fines of $1,000.00 on each count. Finally, he was sentenced to five years' imprisonment on Count 5 and a committed fine of $5,000.00. The

### PROCEEDINGS BELOW

The Grand Jury indicted J.C. Lane for mail fraud in connection with the El Toro Restaurant fire (Count 1). It indicted both J.C. and Dennis Lane for mail fraud related to the duplex fire (Counts 2–4). They also were both indicted for conspiracy to commit mail fraud in the course of the Lubbock flower shop scheme (Count 5). Finally, Dennis Lane was indicted for perjury before the Grand Jury (Count 6). The indictment alleged that he committed perjury by denying that Sidney Heard was involved with the flower shop or with the transactions between Lane and George Lankford.

J.C. and Dennis Lane were tried jointly before a jury in the United States District Court for the Northern District of Texas, Amarillo Division. They filed pre-trial Motions for Severance, contending that their offenses were misjoined in violation of Fed. Rule Crim.Proc. 8(b). They renewed the motions at the end of the Government's evidence, and again at the close of all evidence. The trial court denied the motions each time.

The jury convicted the defendants on each count against them. J.C. Lane was sentenced to a total of seven years' imprisonment and committed fines of $9,000.00.[5] Dennis Lane was found suitable for treatment under the Youth Corrections Act, 18 U.S.C. § 4216. He was committed to the custody of the Attorney General for treatment and supervision under 18 U.S.C. § 5010(b) until discharged.

This appeal follows.

### ISSUES

The appellants argue first that the various counts were improperly joined. We agree that Count 1 should not have been joined with the others because it was not

terms of imprisonment in Counts 2–4 were to run concurrently; and the terms in Counts 1 and 5 were to run concurrently. However, the terms on Counts 2–4 were to run consecutively to the terms in Counts 1 and 5, for a total of seven years' imprisonment.

part of the same series of acts or transactions as Counts 2 through 6.

The appellants also argue that the evidence was insufficient to support the convictions for mail fraud, because the mailings did not further the fraudulent schemes. We reject this argument. The jury could find that the schemes were furthered by the mailings cited in the indictment, including those mailings which occurred after the defendants had received their insurance payments. Such subsequent mailings helped to lull the insurance companies into a sense of complacency.

. Finally, Dennis Lane argues that the evidence of perjury before the Grand Jury was insufficient. He contends that the questions concerning Sidney Heard's involvement were too ambiguous and imprecise to form the basis for a conviction. Moreover, he argues that his answers were literally truthful or the result of an honest mistake. We reject all of those claims and hold that the evidence was sufficient to support a conviction.

## DISCUSSION

### I. Misjoinder

■■■ Federal Rule of Criminal Procedure 8 governs the initial joinder of counts in a criminal trial. Because this case involves multiple defendants as well as multiple counts, we look to Rule 8(b) for the relevant standards. *See United States v. Welch*, 656 F.2d 1039, 1049 (5th Cir. Unit A 1981); *United States v. Levine*, 546 F.2d 658, 661 (5th Cir.1977). Rule 8(b) provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Improper joinder under Rule 8(b) is inherently prejudicial. *United States v. Dennis*, 645 F.2d 517, 521 (5th Cir.1981); *United*

*States v. Marionneaux*, 514 F.2d 1244, 1248 (5th Cir.1975). The granting of a motion for severance, where there has been misjoinder, is mandatory and not discretionary with the district court. *Id.* Thus, misjoinder under Rule 8(b) is a matter of law and completely reviewable on appeal. *United States v. Welch, supra*, 656 F.2d at 1049; *United States v. Marionneaux, supra*, 514 F.2d at 1048.

■■■ The critical question in this case is whether all of the counts are part of the same series of acts or transactions. The answer to that depends

> "on the relatedness of the facts underlying each offense .... [W]hen the facts underlying each offense are so closely connected that proof of such facts is necessary to establish each offense, joinder of defendants and offenses is proper." *United States v. Gentile*, 495 F.2d 626, 630 (5th Cir.1974). When there is no "substantial identity of facts or participants between the two offenses, there is no 'series' of acts under Rule 8(b)." *Marionneaux*, 514 F.2d at 1249.

*United States v. Welch, supra*, 656 F.2d at 1049; *see United States v. Nettles*, 570 F.2d 547, 551 (5th Cir.1978).

There is no substantial identity of facts between Count 1 and the other counts. The El Toro fire and the related fraud on the Transamerica Insurance Group involved events that were entirely separate from the other crimes and that were completed before the other crimes began. There was no fact that could be proved to establish guilt under Count 1 which would also establish any of the other offenses. *See United States v. Welch, supra*, 656 F.2d at 1049; *United States v. Gentile, supra*, 495 F.2d at 630.

The government concedes this point, but argues that there is a substantial identity of participants between the El Toro fraud and the other crimes. Specifically, Sidney Heard and J.C. Lane participated in each of the three arson schemes. This does not, however, establish any identity of participants between Counts 1 and 6. Dennis Lane was the sole participant in Count 6,

committing perjury before the Grand Jury. We have found no evidence in the record, and the government has not attempted to argue, that Dennis was a participant in Count 1, the El Toro fraud.

■ We also fail to find a sufficient identity of participants to justify the joinder of Count 1 with Counts 2 through 5. Heard and J.C. Lane were two out of the five participants in the duplex fraud [6] and two out of the four participants in the flower shop conspiracy.[7] This court has held that the mere identity of a small number of participants will not justify the joinder of multiple offenses involving several persons. The offenses must be shown to be part of a single plan or scheme. *See United States v. Welch, supra,* 656 F.2d at 1049; *United States v. Levine,* 546 F.2d 658, 662–63 (5th Cir.1977); *United States v. Nettles, supra,* 570 F.2d at 551; *United States v. Marionneaux, supra,* 514 F.2d at 1248. Mere similarity of the offenses is not sufficient. *See United States v. Diaz-Munoz,* 632 F.2d 1330, 1336 (5th Cir.1980); *United States v. Marionneaux, supra,* 514 F.2d at 1248; *see also United States v. Welch, supra; United States v. Nettles, supra.* Otherwise the government could take any two counts, however disconnected, and join them in one trial so long as they involved the same type of crime and some of the same defendants. The requirement of a common scheme ensures that the offenses are actually part of a *series* of transactions.

Proof of a common scheme is typically supplied by an overarching conspiracy from which stems each of the substantive counts. *See, e.g. United States v. Nickerson,* 669 F.2d 1016, 1022 (5th Cir. Unit B 1982); *United States v. Phillips,* 664 F.2d 971, 1016 (5th Cir. Unit B 1981); *United States v. Leach,* 613 F.2d 1295, 1303 (5th

Cir.1980). The indictment in this case charges no such conspiracy, however. Count 5 alleges a conspiracy to commit mail fraud in the Lubbock flower shop scheme, but that conspiracy did not encompass the prior El Toro fraud. *See United States v. Gentile, supra,* 495 F.2d at 632.

Nor does the indictment allege, or the evidence show, a single scheme involving all three fires. The El Toro fraud was conceived more than a year before the other offenses. It involved a different victim than the other crimes. *Compare United States v. Dennis, supra,* 645 F.2d at 520–21. The government points us to no evidence at trial showing that there was a greater plan to commit a series of arsons for profit when the El Toro fire was planned and carried out. On the contrary, when J.C. Lane first approached Sidney Heard and proposed the El Toro fire, Lane stated that he was in a losing restaurant business and wanted to get out of his lease and his partnership with Jack Stotts. The other two fires, by contrast, did not involve legitimate ongoing businesses with innocent partners;[8] both the duplex and the flower shop were set up purely for an insurance scam.

There is other evidence of a single scheme involving Counts 2 through 6. J.C. Lane, Dennis Lane, and Sidney Heard discussed both the duplex fire and the flower shop plan at a meeting in J.C. Lane's office several weeks after the duplex burned. In addition, the Lanes invested insurance proceeds from the duplex fire into the Lubbock venture. Thus, Counts 2 through 5 may be joined together. Moreover, since Count 6 involves perjury about Heard's participation in part of the scheme, that count may also be joined.

There are no such links, however, to Count 1. We hold that it was improperly

6. The participants in that offense were J.C. Lane, Dennis Lane, Andrew Lawson, Sidney Heard, and Marvin McFarland (whom Heard instructed to burn the duplex).

7. The participants in that conspiracy were J.C. Lane, Dennis Lane, Sidney Heard, and William Lankford.

8. The other partners in the El Toro restaurant (Jimmy Lane, Bill Dale, and Jack Stotts) have not been implicated in the arson plan.

joined with Counts 2 through 6. Rule 8(b) misjoinder is prejudicial *per se* in this circuit. *See United States v. Levine, supra,* 546 F.2d at 661; *see also United States v. Dennis, supra,* 656 F.2d at 521. Therefore, we reverse and remand. If the government still wishes to try J.C. Lane and Dennis Lane together, Count 1 must be severed from the others.

## II. Sufficiency of Evidence

### A. Mail Fraud

■ The appellants also argue that the evidence was insufficient to support the convictions for mail fraud in Counts 1 through 4. The mail fraud statute, 18 U.S.C. § 1341, only reaches those instances in which the use of the mails is part of the execution of a fraud. *See Kann v. United States,* 323 U.S. 88, 93–95, 65 S.Ct. 148, 150–151, 89 L.Ed. 88 (1944). The appellants make two separate arguments that the mailings alleged in the indictment did not further the El Toro fraud or the duplex fraud.

■ First, with respect to the El Toro Restaurant fire, the indictment alleges that on June 1, 1979, J.C. Lane caused to be mailed an envelope containing two items. They were: (1) a memorandum by David Lard (Transamerica's adjustor) requesting his company's advice on settling the "business earnings/loss of profits" portion of Lane's policy; and (2) a list of monthly income and expenses for the El Toro Restaurant submitted by J.C. Lane. The indictment alleges that the mailing was for the purpose of executing a scheme to defraud Transamerica.

Lane contends, however, that the mailing did not have a sufficiently close relationship to the alleged scheme. *See United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 647, 38 L.Ed.2d 603 (1974). He argues

that the information mailed on that occasion concerned only his own business expenses and that the mailing could not have furthered the execution of the fraud because he did not receive payment until five months later.

We disagree and hold that a jury could find that the mailing was for the purpose of executing the fraud. The memorandum by Lard was an early step in processing the claim under the business earnings portion of Lane's policy. It requested the company to consider the claim and render advice on a proper settlement. A reasonable jury could find that the memo helped get the wheels rolling and ultimately led to a payment under the claims.[9]

Moreover, the list submitted by J.C. Lane contributed to the process. Contrary to appellant's assertion, the list never purports to register only J.C.'s business expenses. Rather, it is styled "a breakdown of income and expenses for *El Toro Restaurant* taken from averaging September, October, November and December records." Government's Exhibit 13 (emphasis added). Lard's memo refers to the list in the context of the business expense claim and describes it simply as a "list of profits[,] expenses[,] etc." *Id.* Reasonable jurors could conclude that J.C. submitted the list in support of the claim. They could also conclude that the list purported to provide Transamerica with an estimate of the average net profits the restaurant would have earned had it not been damaged.

Thus, the list was closely related to the fraudulent scheme. Moreover, its mailing furthered the execution of the fraud even though the ultimate settlement of the claim was for a different amount and was paid five months later. By submitting the estimate of lost earnings, Lane implicitly reemphasized his belief that the restaurant

---

**9.** J.C. could have reasonably forseen that Lard would send such a memo to the company headquarters after a claim was made for business expenses; therefore, J.C. can be said to have "caused" the mailing of the memo. *See United States v. Shaid,* 730 F.2d 225, 229 (5th Cir.1984).

We have held that when an individual does an act with the knowledge that the use of the mails will follow in the ordinary course of business, or when such use can reasonably be forseen, even though not actually intended, then he/she "causes" the mails to be used. *Id.*

had a legitimate claim under the policy. Furthermore, his submission was a first step in the negotiations leading up to a final settlement. In sum, there was sufficient evidence to support the verdict on Count 1.

■ The appellants' argument with respect to Counts 2 through 5 is a bit more subtle but equally unavailing. The mailing alleged in Count 2 included a report by William Liles (the adjustor for Trinity Universal) and a Proof of Loss submitted by Dennis Lane and Andrew Lawson. The mailing in Count 3 included a separate memo by Liles and two Proofs of Loss submitted by Lane. In each case, the Proof of Loss corresponded to a payment that the insured had already received from Trinity Universal.[10] Likewise, the final mailing (containing fraudulent invoices prepared by Heard and J.C.) came on September 18, 1980, *two days after* the final payment under the policy.

The Lanes argue that none of these mailings was "for the purpose of executing the fraudulent scheme" because each mailing came after payment had been received—i.e. after the scheme had reached its fruition. *See United States v. Ledesma*, 632 F.2d 670, 677–78 (7th Cir.1980). In *Ledesma*, a defendant was charged with mail fraud in connection with a scheme to defraud an insurance company. He reported the theft of his mobile home, although it had not actually been stolen. Upon receiving a check from the insurance adjustor, he submitted a false Proof of Loss. The Seventh Circuit held that the scheme had reached fruition with the delivery of the check. Therefore, the subsequent mailing of the

Proof of Loss did not come within the Mail Fraud statute. *Id.*

The Seventh Circuit relied upon the Supreme Court's reasoning in *United States v. Maze, supra.* We hold, however, that *Maze* is distinguishable from the present case. In *Maze*, the respondent Thomas Maze had stolen Charles Meredith's Bank Americard in Louisville, Kentucky, and then travelled to Southern California. Along the way, he had obtained food and lodging by presenting the card and fraudulently signing Meredith's name. Maze was indicted for mail fraud because the sales slips were returned by mail to the Louisville bank that had issued the card, and ultimately the bank mailed the slips to Meredith. The Supreme Court held that the scheme reached its fruition when Maze received his goods and services. *Id.* 414 U.S. at 400–402, 94 S.Ct. at 648–649.

Moreover, the Court held that the subsequent mailings were not in execution of the fraud because there was no evidence that they could enhance the success of Maze's scheme:

[T]here is no indication that the success of his scheme depended in any way on which of his victims [the motels or the bank] ultimately bore the loss. Indeed, from his point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all.

*Id.* at 402, 94 S.Ct. at 649. The Court distinguished *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), in which subsequent mailings were held to be in execution of fraud because they were designed to lull the victims into a false sense of security and postpone inves-

10. The first Proof of Loss was dated May 9, 1980; it substantiated a loss of $7,000.00. L & L Properties (the company of Lane and Lawson) received a draft for $7,000.00 on that same date. The Proof of Loss and Liles' report were mailed on May 15.

The Proofs of Loss alleged in Count 3 were not dated, but they were mailed along with Liles' memo on August 6, 1980. One of them claimed a loss of $3,000.00. Both sides agree that this document corresponded to a payment made on May 30, 1980. The other Proof of Loss

claimed $2,000.00. The appellants argue that it corresponded to a payment made on May 21. The Government replies that the May 21 payment was represented by an entirely separate $2,000.00 Proof of Loss mailed on May 25. The Government, however, never explicitly denies that either of the Proofs of Loss mailed on August 6 reflected a prior payment. Therefore, we will assume *arguendo* that each of the Proofs of Loss corresponded to money already received from Trinity Universal.

tigation. Maze could not have intended the mailing of his sales slips to have such a lulling effect. "[T]he successful completion of the mailings from the motel owners ... to the Louisville bank [and ultimately to Meredith] increased the probability that respondent would be detected and apprehended." 414 U.S. at 403.

In the present case, however, the jury could infer that the mailings were intended to and did have a lulling effect.[11] The Proofs of Loss and the false invoices submitted by Dennis Lane were "designed to ... make the transaction less suspect," convincing Trinity Universal that the claims were legitimate. *United States v. Schaid, supra* note 9 at 230; *United States v. Toney,* 598 F.2d 1349, 1353 (5th Cir.1979), *citing United States v. Sampson, supra.*

The Proofs of Loss declared that the "loss did not originate by any act, design or procurement on the part of [the] insured" and that no attempt had been made to deceive the insurance company. Trinity required the insured to submit the forms; any failure to comply might have alerted Trinity to the possibility of a fraud.

Similarly, the invoices gave the impression of a perfectly innocent claim. The building supplies and furniture that Lane claimed to have purchased for the duplex were set out in minute detail. The invoices were dated randomly and torn out of the invoice book at random points to indicate that L & L Properties was not the sole customer of the "supplier" Trim-Tex. A reasonable jury could find that all of these details were intended to lull Trinity into a false sense of security.

The three mailings were for the purpose of executing the fraudulent scheme. The evidence was sufficient to support the mail fraud convictions.

### B. Perjury Before the Grand Jury

■ Dennis Lane also contests the sufficiency of evidence on the perjury count. The indictment alleges that he committed perjury by denying that Sidney Heard had anything to do with the flower shop or with Dennis's dealings with Lankford. Dennis argues that the evidence was insufficient for three interrelated reasons:

1. The questions propounded to Appellant before the Grand Jury were so ambiguous and imprecise that such questions cannot serve as a predicate for prosecution and conviction for making a false statement in response to such questions;

2. Appellant gave literally truthful answers to the ambiguous and imprecise questions propounded to him before the Grand Jury; and

3. Appellant's answers were the result of honest mistake and misunderstanding of ambiguous and imprecise questions.

Appellants' Brief at 24–25.

Dennis Lane claims that the questions were ambiguous, because they could be interpreted to ask whether Heard owned the flower shop. It is true that the

> essence of the crime of false swearing is the defendant's knowledge at the time of his testimony that it is untrue.... The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry.

*United States v. Crippen,* 570 F.2d 535, 537 (5th Cir.1978); *see also Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). The questions put to Dennis Lane, however, were not ambiguous in the context of the case. *See United States v. Makris,* 483 F.2d 1082, 1087–88 (5th Cir.1973). Sidney Heard had been intimately involved with the flower shop and with the transactions between Dennis Lane and William Lankford. Heard proposed the flower shop scheme at the original meeting in J.C. Lane's office. Heard said that he knew a man who could supply the flowers; and after the meeting, he visited Lankford to solicit his participation in the fraud.. Heard introduced Lankford to Den-

---

11. The trial judge had instructed the jury that mailings "which facilitate concealment of the scheme are mailings in furtherance of the scheme." Record at 292.

nis Lane in June, 1980, when Heard and Dennis came out to inspect Lankford's existing flower shop. Then, in July, Heard helped Dennis pick out the property in Lubbock for the new shop that was to be burned. Before parting that day, Dennis gave Heard a check made out to L & L Designs (Lankford's company) for the first shipment of flowers.[12]

Heard and Lankford planned to split $20,000.00 of the insurance proceeds, as reflected by a $20,000.00 note payable to L & L Designs from Lane's Flower Designs. Lankford drew up the note, and Heard hand-delivered it to Dennis Lane to be signed. After it was signed, Heard kept the original. Heard also delivered fictitious invoices from Lankford to Lane.

Clearly, the question whether Heard had *"anything to do with* the flower shop" would cover his involvement in the scheme. The question does not mention ownership of the shop, but asks whether Heard had *any* involvement. The jury could properly find the question unambiguously covered his conduct. In the same way, the question whether Heard had *"anything to do with* [Dennis's] dealings with Mr. Lankford" clearly covered Heard's close involvement in recruiting Lankford, introducing him to Dennis, and delivering documents from one to the other. We cannot agree that the questions were so ambiguous and imprecise as to preclude a guilty verdict. A reasonable jury could find that Dennis understood the questions and knew that his answers were false.

## CONCLUSION

In sum, we find that Count 1 was improperly joined with Count 2 through 6. We must reverse and remand. None of the counts is dismissed outright, however, because the evidence was sufficient to support the convictions for mail fraud and perjury.[13]

REVERSED and REMANDED.

**12.** During his testimony before the Grand Jury, Dennis stated that he had given Lankford $5,000.00 cash for the flowers. Later, on June 26, 1981, Dennis's attorney wrote a letter to government counsel stating that Dennis had found the check to L & L Designs. The check refreshed his memory, and he now recalled that he had delivered the check rather than cash to Lankford. At trial, however, Dennis conceded that he had given the check to Sidney Heard.

**13.** The appellants have not challenged the sufficiency of evidence on the conspiracy count.