# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

‒‒‒‒‒‒‒‒‒‒

m 98-20758

‒‒‒‒‒‒‒‒‒‒

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ABRAHAM MELAWER; MARK R. SKELTON;
KENNETH R. BURROUGHS; and MARK E. BURROUGHS,

Defendants-Appellants.

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒

Appeals from the United States District Court
for the Southern District of Texas
(H-97-CR-169-2)

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒

December 21, 1999

Before GARWOOD, SMITH, and
BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Mark Skelton, Abraham Melawer, Kenneth Burroughs, and Mark Burroughs challenge their bank fraud convictions. We affirm Skelton's conviction on count one but reverse the remaining convictions.

I.

The defendants were indicted for bank fraud in violation of 18 U.S.C. § 1344(1), based on banking activity at Westheimer National Bank ("WNB").[2] Skelton was senior vice president of WNB, and the other three defendants were customers. The three indictment counts share one common element: Skelton is charged with bank fraud for defrauding WNB through involvement in a check kiting scheme. In count one, the other participants in the alleged scheme are Ira and

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[2] Section 1344(1) prescribes criminal penalties for anyone who "knowingly executes, or attempts to execute, a scheme or artifice . . . to defraud a financial institution . . . ."

James Finlay; in count two the other participant is Melawer; and in count three the other participants are Kenneth and Mark Burroughs.[3] The Finlays pleaded guilty to bank fraud under a plea agreement requiring them to cooperate in the prosecution of Skelton, against whom they then testified.

Count one alleges that over a period of approximately one and one-half years, Skelton approved the payment of checks when there were insufficient funds in the Finlays' accounts, approved immediate credit on deposits and automobile drafts, and deceived the board of directors of WNB with respect to the true nature and extent of unsecured credit thus extended. These actions allegedly inflated the Finlays' account balances and put those inflated balances at their disposal, permitting the Finlays' accounts to become overdrawn.

Counts two and three allege almost identical schemes, count two involving Skelton and Melawer and count three involving Skelton and the Burroughses. Both schemes allegedly took place over a period of slightly less than one year.

Melawer and the Burroughses had several accounts at WNB and other financial institutions, some of which were in the names of corporate entities controlled by either Melawer or the Burroughses, respectively. Skelton allegedly approved the payment of checks when there were insufficient funds in their accounts, approved immediate credit on deposits, and deceived the board with respect to the true nature and extent of unsecured credit thus extended. This inflated the account balances and put them at defendants' disposal, allowing the accounts to become overdrawn. Melawer and the Burroughses allegedly knowingly wrote checks drawn on accounts with insufficient funds; they would deposit these checks into a WNB account at the end of the month to create the appearance of a positive balance during the float.[4]

II.

The defendants claim there is insufficient evidence to support their convictions. "In evaluating a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and uphold the verdict if, but only if, a rational juror could have found each element of the offense beyond a reasonable doubt." *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999). This review is *de novo*, and "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, a defendant is entitled to a judgment of acquittal." *Id.* (internal quotation marks omitted). Based on this standard of review, we conclude that the evidence is sufficient to sustain Skelton's conviction on count one but that there is insufficient evidence to sustain the remaining

---

[3] There was also a count four involving criminal forfeiture pursuant to 18 U.S.C. § 982, but this count was dismissed in a post-trial proceeding. Count two alleges that Skelton and Melawer knowingly executed and attempted to execute a scheme and artifice to defraud WNB, each aiding and abetting the other. The allegation in count three is identical as between Skelton and the Burroughs.

[4] The "float" is the time between when the funds are registered in the account and when payment is received by the bank. If immediate credit is available, funds can be withdrawn even if payment will never be received.

convictions of Skelton and the convictions of Melawer, Kenneth Burroughs, and Mark Burroughs.

### A.

Because some of the evidence is not admissible against the customer defendants, we first consider Skelton's sufficiency claim as to count one. To convict under § 1344(1), the government must prove beyond a reasonable doubt that the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution. Defendants do not contest their participation in the kiting schemes; rather, they argue a defense of lack of intent to defraud.

Skelton contends that in 1989, WNB was in financial straits and in danger of closing and required some source of increased income, so WNB's management made a decision that fee income would be the bank's main thrust. In particular, it would focus on fees generated by paying checks that otherwise would be returned for insufficient funds, known as "NSF" checks. The bank also would pay checks that were drawn against uncollected balances, which occur when a customer makes a deposit but payment has not yet been received from the bank on which the deposit is drawn.

Creating overdrafts by paying NSF checks and making deposited funds immediately available allowed profitable and continuous check kiting. Skelton claims that these practices were successful in producing much-needed income, and further urges that even if the policy was a poor banking decision (as allowing the kiting can lose money in interest paid on the inflated amounts and in effect gives the account holder an unsecured loan), it was not a criminal decision.[5]

For Skelton's argument to succeed, the entire bank entity had to be behind the "policy," for we have previously held that bank officers "with authority to bind their banks to others can nevertheless defraud the institutions they serve." *United States v. Saks*, 964 F.2d 1514, 1518 (5th Cir. 1992). Thus, in *Saks* defendants who had colluded with bank officers who were co-chairmen of the board and owned a controlling interest in the institution were found guilty of bank fraud: "It is the financial institution itselfSSnot its officers or agentsSSthat is the victim of the fraud the statute proscribes." *Id.*; *see also United States v. Aubin*, 87 F.3d 141, 146-47 (5th Cir. 1996). Likewise, bank customers "who collude with bank officers to defraud banks may also be held criminally accountable either as principals or as aiders and abettors." *Saks*, 964 F.2d at 1518-19.

The government presented sufficient evidence to enable a rational juror to reject Skelton's "bank policy" claim. Skelton pushed the Finlays and all three co-defendants to "clear" their overdrafts as of the last day of each month, meaning that those overdrafts would not appear on the monthly report to the board of directors. The customers repeatedly used checks drafted from accounts with insufficient funds for this purpose, and therefore in a manner of days the WNB account would once again return to overdraft status.

---

[5] In other words, Skelton's characterization is that the bank knew of the kiting and remained silent because it collected fees in exchange for giving preferred customers off-the-books loans.

Skelton does not contest that he urged the Finlays and other defendants to clear their overdrafts at the end of each month, but he contends that he had no criminal motive in doing so. Ira Finlay testified, however, that Skelton informed him that the reason that accounts must not be overdrawn on the last day of the month is that such overdrawn accounts would appear on the monthly report. Further, James Finlay testified that he informed Skelton that they were using floated funds to cover their monthly overdrafts.

Skelton's desire to keep the overdrafts from appearing on the monthly board report might not be independently sufficient to demonstrate that kiting was not bank policy, but there is abundant other evidence in this regard. Skelton was also involved in the deletion of certain references to Finlay overdrafts in a quarterly report, and WNB's cashier, Glenda Mayo, testified that Duff informed Skelton of his concern with the Finlays' situation numerous times and expressed concern with the Burroughs and Melawer accounts. In fact, Skelton falsely assured Mayo and other bank employees that the situations either would not continue or that the relevant customers would deposit sufficient collateral to cover the risks of their accounts.

Mayo further testified that Skelton often waived the $25 NSF check fee for the defendants, making it unlikely that focusing on such fee income was the bank's policy. Lastly, she testified that the bank wanted account overdrafts cleared at any time during the month (not just as of the last day of the month), and that such "clearing" was not supposed to be done with an NSF check that would create another overdraft.

Skelton also received cash and in-kind pay-offs from Ira Finlay: In addition to certain trailers and perhaps overly generous deals on vehicles, Finlay gave Skelton approximately $500 per week ($100 a day) throughout the period in which the Finlays engaged in the kiting activity. Ira Finlay testified that he withheld cash from checks he deposited in his WNB account, put the cash in a plain envelope, and presented the envelope to Skelton. This testimony was corroborated by two other witnesses: a bank employee who recalled that Ira Finlay often requested cash back from his deposits in hundred dollar bills and requested an envelope at those times; and an employee of Ira Finlay's who both witnessed Finlay giving an envelope to a man at WNB and took an envelope to a secretary at WNB on behalf of Finlay three or four times.

As to the board's knowledge of Skelton's "policy," the board did not have daily overdraft information in its monthly report. The board chairman, Champion Traylor, Jr., testified that he was surprised to learn the status of the Finlay accounts when it was uncovered by bank regulators and that he did not previously know of any such pattern of immediate credit and large overdrafts. He feels that he was misled as to the financial status of the bank and would have tried to stop the overdraft situation had he known of it. Another member of the board, Doyle Graham, Jr., testified that he was shocked to learn of the Finlay situation and that the board had no information from which it could have predicted that situation until it was uncovered by outside regulators.

A federal bank examiner, Bryan Heath, likewise testified that in reviewing the board reports, he found nothing that would arouse

suspicion as to the true state of the accounts at issue. He further testified that most banks earn a significant amount of money from NSF and similar fees and that, in his professional opinion, Skelton's conduct caused the overdrafts to be unknown to the board.

Notwithstanding this evidence, Skelton insists that it was bank policy to clear overdrafts at the end of each month; he stresses that there was nothing preventing the other board members from perusing the bank's daily reports if they so desired. Skelton cites evidence that Duff, Skelton, and Mayo met every day to review all pending NSF checks and checks presented for payment against uncollected balances. Therefore, the senior officers of WNB and at least two members of the board (Duff and Skelton) were aware of Skelton's actions. As noted above, however, there was at least some controversy among these individuals regarding defendants' accounts, and Skelton presented no evidence from Duff or other board members that such activity was bank policy.

Skelton also points out that in 1992, over 66% of the bank's income came from NSF charges, and therefore he argues that the board must have been aware of his activities. Such a conclusion simply does not follow: An NSF check for $3 that is cleared the next day earns the same $25 fee as an NSF check for $1,000 that is not cleared for three months. As far as the information given to the board indicated, the bank was earning substantial income from NSF fees, and only a relatively small number of customers were still in overdraft status at the end of each month (and those not by a significant dollar amount).

Therefore, the board had every reason to believe that, although there must be a substantial number of NSF checks being paid to generate that much fee income, the resulting overdrafts were consistently cleared with legitimate funds in relatively short periods of time, leaving the bank in a comparatively low-risk situation. In fact, this was not the case.

As we have said,

[c]heck kiting is a scheme designed to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds. Section 1344(1) does not require a specific intent to permanently deprive the bank of its funds. It is sufficient to knowingly participate in a scheme to trick the bank into inflating bank balances by kiting checks between two or more banks. The bare act of check kiting defrauds the bank by temporarily placing the bank's funds at the disposal of the account holder.

*United States v. Frydenlund*, 990 F.2d 822, 824 (5th Cir. 1993) (internal quotation marks and citations omitted). Under this test, a rational juror could find that the government proved Skelton's guilt on count one beyond a reasonable doubt; the evidence makes it rational to reject Skelton's contention that there was never any intention to "trick" the bank.

B.

While some of the evidence discussed above also is relevant to the culpability of Melawer and the Burroughses, much of it is not, and there is not sufficient evidence for a rational juror to find that beyond a reasonable doubt these defendants intended to defraud WNB. The government presented no

convincing evidence that Melawer and the Burroughses were doing anything more sinister than banking pursuant to policies expounded by their friend Skelton in his official capacity.

Skelton had business relationships with Melawer and the Burroughses beyond their banking concerns; the defendants do not deny that they might be considered friends in this regard. The evidence also made clear that both Melawer and the Burroughses knowingly "cleared" overdrafts with bad checks, and the defendants presented no evidence that they were in fact told that this was acceptable bank policy.

The government bears the burden of proof, however, and must therefore prove that these defendants had the intent of tricking the bank. There is no evidence in this regard. Although the customer defendants engaged in conduct in a repeated pattern that ultimately caused WNB to lose money, there is no evidence that they did so without the authority of the bank, or at least without the apparent authority of the bank through Skelton. Therefore, no rational juror could have found that the government proved the guilt of Melawer, Kenneth Burroughs, or Mark Burroughs beyond a reasonable doubt; we therefore reverse their convictions based on insufficiency of the evidence.

## C.

Having reversed the convictions of Melawer and the Burroughses, we must also reverse the conviction of Skelton on counts two and three. The government alleged execution of a scheme to defraud WNB through the actions of Melawer and the Burroughses. Having found insufficient evidence of criminal intent motivating those actions, we find insufficient evidence that Skelton aided and abetted any scheme to defraud WNB in counts two and three.

### III.

Skelton claims several other issues on appeal. None presents reversible error.

### A.

Skelton claims that the district court erred in finding that defendants were properly joined under FED. R. CRIM. P. 8(b),[6] and alternatively that the court abused its discretion in denying his motion to sever pursuant to FED. R. CRIM. P. 14. A claim of misjoinder is reviewable on appeal as a matter of law; if the limits of rule 8(b) are exceeded, severance will be granted unless the court concludes that the error was harmless. *See United States v. Maggitt*, 784 F.2d 590, 595 (5th Cir. 1986).

The defendants did not participate in the same act or transaction, and therefore for joinder to be proper under the rule, they must have participated in "the same series of acts or transactions constituting an offense or offenses." In *United States v. Marionneaux*, 514 F.2d 1244, 1248-49 (5th Cir. 1975), this court defined the phrase "the same series of acts or transactions" as requiring a "substantial identity of facts or participants" between two offenses. Because the only identity of participants is Skelton's role in all counts, there is no substantial identity of participants to satisfy the rule.[7]

Therefore, to satisfy rule 8(b) there must be a substantial identity of facts among the defendants' offenses.

> Whether or not separate offenses are part of a 'series of acts or transactions' under 8(b) depends on the relatedness of the facts underlying each offense. When the facts underlying each offense are so closely connected that proof of such facts is necessary to establish each offense, joinder of defendants and offenses is proper.

*Welch*, 656 F.2d at 1049. This court has previously found joinder to be improper where multiple defendants were joined without the requisite substantial identity of facts. *See, e.g.*, *Lane*, 735 F.2d at 799; *Levine*, 546 F.2d at 658.

We need not decide this issue, however, because even if misjoinder did occur, it was harmless as to Skelton. "[A]n error involving misjoinder affects substantial rights and requires reversal only if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *Lane*, 474 U.S. at 449 (internal quotation marks omitted).

Melawer and the Burroughses were tried for bank fraud based on their banking

---

[6] Rule 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

[7] *See United States v. Lane*, 735 F.2d 799, 804-05 (5th Cir. 1984), *rev'd on other grounds*, 474 U.S. 438 (1986); *United States v. Welch*, 656 F.2d 1039, 1049 (5th Cir. Unit A Sept. 1981); *United States v. Levine*, 546 F.2d 658, 664-66 (5th Cir. 1977).

interactions at WNB. Skelton was tried for bank fraud based on his role in those very interactions. Joinder therefore did not prejudice Skelton, making any misjoinder harmless error.

Likewise, the court did not err in denying Skelton's motion to sever pursuant to FED. R. CRIM. P. 14. That rule provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Balancing the right of a defendant to a fair trial against the interests of judicial economy is within the discretion of the court, and we will not reverse absent abuse of discretion. *See United States v. Morrow*, 177 F.3d 272, 290 (5th Cir.), *cert. denied*, 120 S. Ct. 333 (1999); *United States v. Zicree*, 605 F.2d 1381, 1388 (5th Cir. 1979). To demonstrate abuse of discretion, the defendant "bears the burden of showing specific and compelling prejudice that resulted in an unfair trial, and such prejudice must be of a type against which the trial court was unable to afford protection." *Morrow*, 177 F.3d at 290 (internal quotation marks omitted). Skelton contends that he was prejudiced by joinder both because joinder prevented him from calling Melawer and the Burroughses to the stand to give exculpatory testimony (because of their Fifth Amendment privilege against self-incrimination) and because of guilt by association (prejudice from evidence admitted with respect to other counts

and other defendants resulted in spillover prejudice in the minds of the jurors).

Skelton argues that a key issue is what he told each of the co-defendants regarding the reason for that defendant's making a deposit at the end of each month, especially in light of the testimony of Ira Finlay that Skelton told him the monthly board meetings were the reason. By joining Melawer and the Burroughses, Skelton was prevented from calling them as witnesses on his behalf. Likewise, because there was evidence of payments from the Finlays, Skelton argues that there was an implication that payment was made by the other defendants as well; once again Skelton was prevented from calling them as witnesses on his behalf.[8]

In *United States v. Rocha*, 916 F.2d 219, 231-32 (5th Cir. 1990), we held that

> [e]xculpatory testimony in some cases may provide the basis for a severance. In order to demonstrate a prima facie case for severance to introduce exculpatory testimony of a co-defendant, a defendant must show: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant would in fact testify if severance were granted.

_____

[8] Although Skelton argues that he met the criteria of rule 14, he does not seem to argue that regardless of that rule, denial of a severance violated his Sixth Amendment right to compulsory process. Even assuming he has asserted that claim, he did not establish "specific and compelling prejudice" necessary to demonstrate a violation of his Sixth Amendment right. *See United States v. Villarreal*, 963 F.2d 725, 732 (5th Cir. 1992).

Skelton has not indicated, and a review of the record does not reveal, that any such showing was made. Therefore, the court did not abuse its discretion in denying severance on this ground.

There is no merit to Skelton's claim of spill-over prejudice resulting from evidence that would have been inadmissible against him had the defendants/counts not been joined. "The test for severance under Rule 14 is whether the jury could sort out the evidence reasonably and view each defendant and the evidence relating to that defendant separately. If cautionary instructions are deemed sufficient, severance is not required." *United States v. Merida*, 765 F.2d 1205, 1219 (5th Cir. 1985). Skelton does not identify any evidence admissible only against his co-defendants that prejudiced him, nor any evidence admissible only on one count that prejudiced him on other counts in light of his common modus operandi in all three counts. Therefore, the court did not abuse its discretion in denying severance.

### B.

Skelton claims the court erred in admitting evidence of, and evidence produced by, the government's use of computer software in analyzing the check kites. We review evidentiary rulings for abuse of discretion. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 667 (5th Cir. 1999).

Special Agent Morehart, an expert in financial crimes, testified on behalf of the government. His testimony included his manual analysis of the defendants' account activity and a computer analysis performed by software named "Check Kite Analysis System," or CKAS. CKAS, developed by the FBI, is apparently a relatively simple program used to analyze possible check kiting activity.

It is beneficial not because of the complexity of its underlying operations, but because it can tally the results when a large number of transactions (deposits and withdrawals) are involved. Skelton claims that the evidence was irrelevant and prejudicial and that the district court abrogated its gatekeeping role under *Daubert* and its progeny. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999);*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

We have described the gatekeeper role as follows:

> The district judge must first determine whether the proffered testimony is reliable, requiring an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid. Second, the district judge must determine whether that reasoning or methodology can be properly applied to the facts in issue; that is, whether it is relevant.

*Curtis*, 174 F.3d at 668. The government introduced pedigree information on CKAS through its expert, most significantly that in his experience with the program he had found its results to be consistent with manual calculations, and that its underlying theory made it little different from a glorified calculator.

When complex scientific or other expert evidence is at issue, the district court must scrutinize whether the reasoning or methodology underlying it is valid; there is no such issue regarding CKAS. Morehart's testimony regarding its functionality, and his

experience with its results, adequately demonstrate its reliability.

The second part of the gatekeeper role, whether that reasoning and methodology are relevant, is also straightforward: The expert described his use of the program, its results, the results of his manual analysis, and the relevance of each. The testimony was neither irrelevant nor improperly prejudicial. Therefore, the court did not abuse its discretion in allowing the testimony.

## C.

Skelton claims the court erred in admitting evidence of internal WNB rule violations and federal regulatory violations. The government, over objection, introduced evidence of the internal lending limit imposed on Skelton by the board of directors, the loan limit to a single customer imposed on WNB as a whole, and a statement by an employee of the Office of the Comptroller of the Currency ("OCC") that overdrafts were not a safe banking practice.

All three elements are relevant circumstantial evidence regarding why Skelton might have allowed the "loans" through kiting and why he did not want the amounts reflected on the monthly board report. There is no evidence that this testimony was introduced or used in any manner that would lead the jury to believe that violation of those regulatory principles was equivalent to a criminal violation. Therefore, *United States v. Christo*, 614 F.2d 486 (5th Cir. 1980), is inapposite, and the court did not abuse its discretion in admitting the evidence.[9]

_____

[9] In *Christo*, regulatory violations were not only included in the indictment and emphasized throughout the trial, but the court's instructions (continued...)

## D.

Skelton claims the court erred by not granting a new trial based on, or at least holding an evidentiary hearing to investigate, information that one of the jurors was prescribed a muscle relaxant during the trial, that the jurors discussed the case in groups during the course of the trial, and that a juror approached a prospective defense witness regarding the trial. We review the denial of a motion for new trial for abuse of discretionSSthe procedures used to investigate allegations of juror misconduct and the decision as to whether to hold an evidentiary hearing are matters within the sound discretion of the district court. *See United States v. Jobe*, 101 F.3d 1046, 1057-58 (5th Cir. 1996).

Skelton argues that he was effectively improperly tried by a jury of only eleven, because a juror imbibed a prescription muscle relaxant that caused her to "doze off during trial." This information was disclosed to Skelton's counsel through "an unsolicited telephone call after the trial," which call also apparently included information that the jurors had discussed the case in groups of two or three throughout the trial.

Skelton contends that the court erred in failing to hold an evidentiary hearing

_____

(...continued)

regarding the regulatory violations focused the jury's attention on those prohibitions and made it impossible for this court to tell whether Christo had been found guilty under the criminal section at issue or merely for the regulatory violations. *See Christo*, 614 F.2d at 491-92. Nothing even remotely akin to that level of emphasis occurred in this case. *See United States v. Saks*, 964 F.2d 1514, 1522-23 (5th Cir. 1992).

regarding, or accept his motion for new trial based on, this information. He admits to finding no case on point, but states that "[i]f a person is advised not to drive or operate heavy machinery, a common warning with muscle relaxers [relaxants], it seems self evident that the juror had to rely on the recollections of other jurors and could not have formed her own opinion based on all the evidence." Such a generic claim does not rise to a level requiring a court to investigate further, especially in light of the limited ability of a court to inquire into jury deliberations under FED. R. EVID. 606(b), and therefore the district court did not abuse its discretion.

Skelton also raises, but does not argue, error based on the court's handling of juror contact with a potential witness. During trial, the court was informed by the government that one of the jurors had approached a potential defense witness, Sam Goldman of the OCC, at a school track meet. The juror apparently asked Goldman whether he knew anything about WNB. Goldman responded that he was not going to discuss that issue and that the juror should not be asking that question.

Instead of questioning the juror about the incident, the court admonished the jury not to discuss the case with anyone. Skelton contends that this constituted error. In *Jobe*, 101 F.3d at 1057-59, we considered a similar challenge on very different facts. Billie Mac was convicted of, *inter alia*, bank fraud. During trial, one of the jurors discussed the case with a relative and was told that Billie Mac had previously been convicted in another bank fraud case. Even though this "knowledge" was technically incorrect, and the district court denied an evidentiary hearing to investigate and denied a new trial, we affirmed.

Although in *Jobe* the district court did have an affidavit of the juror, the critical difference between *Jobe* and the instant case is that here, there is no evidence of any extrinsic information's reaching any juror. The *Jobe* court recognized a presumption of jury impartiality that may be defeated through evidence that extrinsic factual matter tainted the jury's deliberations. *See id.* at 1058. We therefore stated that a court "must investigate the asserted impropriety only when a colorable showing of extrinsic influence is made." *Id.*

Skelton made no such showing: The information presented to the court indicated that no extrinsic evidence was communicated, and the court had no reason to believe the situation was otherwise. Therefore, the court did not abuse its discretion in choosing to admonish the jury not to discuss the case with anyone.

E.

Skelton claims the court erred in limiting the scope of his expert's testimony. During government voir dire, Sam James Pierce testified that he was qualified as an auditor (He is a certified public accountant and had experience as an auditor with the FDIC and other organizations.) but was not qualified to investigate fraud, had never been a bank examiner or lending officer, and had very little experience with check kiting. The court therefore limited him to testifying on matters of accounting.

We review the exclusion of expert testimony for abuse of discretion. *See United States v. Willis*, 38 F.3d 170, 174 (5th Cir. 1994). Skelton rests his argument on an irrelevant premise: that when the government has been allowed to present its version of how banks should be operated, the defense should

be afforded the same opportunity. The court did not deny that opportunity in this caseSSit merely required that Skelton present a witness qualified to testify to such matters. The court did not abuse its discretion in limiting Pierce's testimony to his area of expertise.

F.

Skelton claims he is entitled to a new trial based on the cumulative error doctrine. In *United States v. Canales*, 744 F.2d 413, 430 (5th Cir. 1984), we recognized that "the cumulative effect of several incidents of . . . misconduct may require reversal, even though no single one of the incidents, considered alone, would warrant such a result." As in *United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992), because there is no merit to any of Skelton's claims of error, his claim of cumulative error must also fail.

G.

Skelton claims the indictment either provided inadequate notice or was constructively amended. First, he avers that the indictment alleges that he deceived the board of directors, when the crime is to deceive WNB itself. Second, he contends that the indictment did not adequately allege how he deceived the board or how he aided and abetted Melawer and the Burroughses in executing a scheme to defraud. Lastly, Skelton contends that the indictment was constructively amended at trial, because the indictment alleges that he made immediate credit available to persons (Melawer and the Burroughses), but he was convicted of making immediate credit available to corporations (Some accounts were held in the name of corporations that Melawer or the Burroughses controlled.). All three claims are meritless.

We review the sufficiency of an indictment *do novo*. *See United States v. Crow*, 164 F.3d 229, 234 (5th Cir.), *cert. denied*, 119 S. Ct. 2051 (1999). The indictment must conform to minimal constitutional standards, and "[t]he proper test for determining the validity of the indictment is whether or not the defendant has been prejudiced by the alleged deficiency." *Id.* at 234-35.

An indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant what charge he must be prepared to meet, and enables the accused to plead acquittal or conviction in bar of future prosecutions for the same offense. An indictment is read for its clear meaning and convictions will not be reversed for minor deficiencies that do not prejudice the accused.

*United States v. Shelton*, 937 F.2d 140, 142 (5th Cir. 1991) (internal citation and quotation marks omitted).

Not only would the minor issues raised by Skelton not have prejudiced his defense, but the indictment was not in fact flawed. It does allege that Skelton defrauded WNB and does describe the manner in which he executed the schemes to defraudSSnamely, by allowing overdrafts, granting immediate credit, and encouraging "removal" of the overdraft on the last day of the month.

"A constructive amendment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. If we find that the indictment has been constructively amended, we must reverse the conviction." *United States v. Holley*, 23 F.3d

902, 912 (5th Cir. 1994) (internal citations and quotation marks omitted).

There was no constructive amendment. The evidence demonstrated that Skelton made immediate credit available to the accounts at issue; some of those accounts were held in the name of corporations control led by defendants. In this manner, Skelton made immediate credit available to the corporations and thus to those controlling the corporations, which persons did in fact exploit that credit as alleged. Skelton does not claim that any of the corporations at issue were not controlled by the named defendants, but merely that the jury was allowed to convict him for making immediate credit available to corporations when the indictment charged that he made that credit available to the persons controlling those corporations. This does not constitute modification of an "essential element of the offense charged," and therefore no constructive amendment occurred.

## H.

Skelton claims that he was improperly convicted on the basis of the uncorroborated testimony of an accomplice, Ira Finlay. This claim has no meritSSFinlay's testimony was corroborated by bank records and substantial other evidence. Even Finlay's testimony regarding the payoffs was corroborated by testimony of a bank employee and of Finlay's employee. *See* part II.A., *supra*.

In summary, Skelton's conviction on count one is AFFIRMED; his conviction on counts two and three and the convictions of Melawer, Kenneth Burroughs, and Mark Burroughs are REVERSED and REMANDED for entry of judgments of acquittal.[10]

_____

[10] Skelton's convictions on counts two and three did not affect the guideline range on count one, but resentencing is necessary to allow recalculation of the special assessment and amount of restitution.