UNITED STATES of America, Plaintiff-Appellee,

v.

Alfonso VELASQUEZ, Ramon Dominguez, Esmerido Galvan Olamendi, Ramon Gomez, and Armando Gomez, Defendants-Appellants.

Nos. 84–1218, 84–1240, 84–1263 and 84–1278.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1985.

Decided Sept. 5, 1985.

As Amended Oct. 18, 1985.

---

G. Roger Markley, Sp. Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Carol A. Brook, Barry A. Spevack, Monico & Pavich, Christine P. Curran, James W.

Reilley & Assoc., Chicago, Ill., for defendants-appellants.

Before WOOD and POSNER, Circuit Judges, and GRAY, Senior District Judge.[*]

POSNER, Circuit Judge.

The five defendants in a three-week criminal jury trial appeal from their convictions and prison sentences ranging from five to fifteen years. Three groups of crimes were charged, which in chronological order are as follows:

(1) All five appellants were charged with trafficking in cocaine.

(2) Galvan was charged with heroin violations unrelated to any other offenses charged in the indictment.

(3) Galvan, Ramon Gomez, and Velasquez were charged with retaliation and conspiracy to retaliate against two government informants, Estevez and a woman named Campana.

The first group of charges related to an alleged sale of cocaine in Chicago in May 1982. Estevez, the government's principal witness, testified that he met with some of the appellants in Miami to plan the trip and pick up the cocaine. At the meeting was "El Toro," the *nom de guerre* of a suspected narcotics racketeer. Estevez and two of the appellants (which two is unclear) drove to Chicago with the cocaine, met the other appellants there, and later went to Rockford with the cocaine. Shortly afterward, Estevez, fearing that he was about to be caught by the FBI, became an informant. The government paid him almost $20,000 for his information.

In June 1982 Galvan twice sold heroin to an undercover agent. These sales were the basis of the heroin charges against Galvan. In October 1982 Galvan and Velasquez kidnapped Estevez and Miss Campana and threatened to kill them for having "snitched" on El Toro. They took the two to the apartment of Ramon Gomez, who

entered later and asked what was going on. He was told to guard Miss Campana while Galvan and Velasquez took Estevez out, but after a while he let her go. Estevez escaped from his captors by offering to get them more drugs and then slipping away en route.

The case against Galvan for the heroin violations and Galvan and Velasquez for retaliating against Estevez and Campana was very strong, notwithstanding some discrepancies between the stories told by Estevez and Campana. But against Ramon Gomez the evidence of intent to retaliate was extremely weak. The jury acquitted him of aiding and abetting the retaliation but found him guilty of conspiracy to retaliate. To be guilty of conspiracy, though, you must know at least in a general way the object of the conspiracy—its essential nature, see *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); *United States v. Williams*, 737 F.2d 594, 614 (7th Cir.1984); *United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir.1944) (L. Hand, J.)—even if you do not know the details (no self-respecting conspiracy encourages candor, even with its own members) and did not join till the conspiracy was under way. There was no evidence that Ramon Gomez knew why he was to hold Miss Campana. The government asks us to infer that he knew why from the fact that the object of the conspiracy was to punish Estevez and Campana for having snitched on the cocaine dealings that were the subject of the first group of charges, in which Ramon Gomez had participated along with the other appellants; but we shall see that there is no evidence that retaliation for informing on those dealings was one of the objects of the conspiracy.

The evidence of cocaine violations was also weak. The cocaine itself never turned up, and the only witness—to the meeting in Miami, the trip to Chicago, the meetings there and in Rockford, and finally the sale itself also in Rockford—was Estevez. A

* Hon. William P. Gray of the Central District of California, sitting by designation.

highly paid informant who had become an informant only when he thought he was about to be caught for his own narcotics dealings, which apparently were extensive, Estevez gave contradictory testimony on such questions as whether he himself was a drug user and which two of the appellants he had driven to Chicago with, and he told several seemingly tall tales on the stand such as that he had floated to the U.S. from Cuba on an inner tube which he propelled by ping pong paddles. The only corroboration of his testimony about the cocaine was by government agents who had seen cars matching descriptions given by him at an address in Rockford where he said the conspirators had met. Since he did not come to the FBI till after the cocaine sale, he was not wired for sound or otherwise under surveillance that might have confirmed his testimony.

We nevertheless disagree with the appellants that no reasonable jury could have found them guilty of the cocaine charges. The testimony of one eyewitness, even if he is a member of the criminal class and has no intrinsic credibility, is enough to convict in the absence of contrary evidence, or of contradictions graver than those shown here; and there was some, though slight, corroboration. Nevertheless the weakness of the cocaine charges—and appellants Dominguez and Armando Gomez were charged with no other crimes—requires us to consider with particular care the appellants' principal argument, which is that they should not have been indicted and tried together for all of the offenses charged.

When a group of people are charged with participating in the same crime, they ordinarily are tried together even if the evidence is stronger against one or some than against others. The danger of prejudice to the least guilty, or perhaps prejudice to all from the sheer confusion of a multidefendant trial, is in all but the most unusual circumstances considered outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all. See, e.g., *United States v. Cavale*, 688 F.2d 1098, 1106 (7th Cir.1982); *United States v. Garza*, 664 F.2d 135, 143 (7th Cir.1981); cf. *United States v. Perry*, 731 F.2d 985, 990 (D.C.Cir. 1984). Although questioned in some quarters, see, e.g., Dawson, *Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices*, 77 Mich.L.Rev. 1379 (1979), this position is too firmly established to be reconsidered by us. But of course the government's right of joinder is not unlimited; its outer bounds are set by Rule 8 of the Federal Rules of Criminal Procedure, and we must consider whether those bounds were exceeded.

Rule 8(a) allows the government to charge in the same indictment two or more offenses by the same defendant if the offenses "are of the same or similar character," and Rule 8(b) allows charging in the same indictment two or more offenders "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." But the government may not tack the two subsections together and in one indictment charge different persons with committing offenses of "similar character." 8 Moore's Federal Practice § 8.06[1], at pp. 8-25 to 8-26 (2d ed. 1985). That would allow true "mass trials," unless the court exercised its power under Rule 14 to sever, for trial, offenses or offenders joined in one indictment if a joint trial would be prejudicial to the defendant(s) or (rarely) the government. In practice, severe prejudice is required for an order of severance and the trial judge's refusal to sever is rarely reversed. See, e.g., *United States v. Gironda*, 758 F.2d 1201, 1220 (7th Cir.1985); *United States v. Moschiano*, 695 F.2d 236, 245-46 (7th Cir. 1982); *United States v. Warner*, 690 F.2d 545, 554 (6th Cir.1982); *United States v. Johnson*, 478 F.2d 1129, 1131 (5th Cir.1973) ("a defendant has an extremely difficult burden of showing on appeal that the lower court's action was an abuse of discretion"). But this is because, given Rule 8, severance under Rule 14 ordinarily is sought in

cases where the offenses and offenders are linked together in a single conspiracy, so that there are substantial economies from a joint trial; if there were no Rule 8, requests for severance under Rule 14 would be received more hospitably. Cf. *United States v. Echeles*, 352 F.2d 892, 896 (7th Cir.1965).

The first question is whether the acts charged in the indictment are "the same series of acts or transactions constituting ... offenses," for if not, we do not get to the question whether severance was required by Rule 14 because of prejudice. They would be the same series of acts (the exact same acts, as a matter of fact) if the government had joined the appellants in a single indictment charging sale of and conspiracy to sell cocaine, which was all one conspiracy, or if it had just joined Galvan, Ramon Gomez, and Velasquez in an indictment charging retaliation against Estevez and Miss Campana, another conspiracy. The question is whether the government could properly combine both groups of charges, along with the heroin charge against Galvan, in the same indictment.

■ This depends on the meaning of "same series of acts or transactions." The usual meaning is acts or transactions that are pursuant to a common plan or common scheme, see, e.g., *United States v. Cavale, supra*, 688 F.2d at 1106; *United States v. Scott*, 413 F.2d 932, 935 (7th Cir.1969); *United States v. Lane*, 735 F.2d 799, 805 (5th Cir.1984), cert. granted, — U.S. —, 105 S.Ct. 1167, 84 L.Ed.2d 318 (1985), which is to say (in the usual case) that the acts or transactions are parts of a single conspiracy, see *id.* So viewed, Rule 8(b) codifies the long-standing practice of trying conspirators together but does not open the door to mass trials—does not, for example, allow all tax evaders whose last names begin with "V" to be tried together, or all tax evaders who have the same zip code, or use the same accountant. See *United States v. Whitehead*, 539 F.2d 1023, 1025 (4th Cir.1976). The indictment need not charge a single overarching conspiracy, provided the separate conspiracies it

charges arise from a common plan or scheme and so could alternatively have been charged as a single conspiracy. But the mere fact that two conspiracies have overlapping memberships will not authorize a single indictment if the conspiracies cannot be tied together into one conspiracy, one common plan or scheme. Misjoinder was found on this basis for two unrelated "torch" jobs involving two of the same conspirators in *United States v. Lane, supra*, and for an indictment that charged both defendants with heroin offenses and one with an unrelated cocaine offense in an overlapping time period in *United States v. Hatcher*, 680 F.2d 438, 440–41 (6th Cir. 1982). See also *United States v. Bledsoe*, 674 F.2d 647, 654–56 (8th Cir.1982); *United States v. Martin*, 567 F.2d 849, 853–54 (9th Cir.1977).

■ There was misjoinder in the present case with respect to the heroin charges against Galvan. The indictment does not relate those charges to any of the charges against the other defendants named in the indictment, and the defect is not merely a technical oversight in pleading. No evidence introduced at trial connected the heroin charges to any of the charges against other defendants. As Estevez was not involved in the heroin sales, there was no link between them and the retaliation. None of the other appellants was involved in the heroin sales and there is nothing to suggest that those sales were made pursuant to a common plan that included the cocaine sale. While selling heroin is "similar" enough to selling cocaine to have allowed the government to charge just Galvan with both types of sale in a single indictment (Rule 8(a)), the test for joining those charges with charges against other defendants is more stringent (Rule 8(b)), and was flunked..

The analysis of the cocaine and retaliation charges is more complex. We take up the question—having found one misjoinder already—since it may bear on whether the misjoinder of the heroin charges against Galvan should be treated as harmless error with regard to any of the appellants.

The government argues that the retaliation was for Estevez's having tattled on the cocaine sale. As a conspiracy and its cover-up are parts of a common plan, see, e.g., *United States v. Harrelson*, 754 F.2d 1153, 1177 and n. 19 (5th Cir.1985), there would be no possible problem of misjoinder if the government's argument had any factual basis (there may be no problem, we shall see, even if it has no factual basis). But we can find none. Granted, El Toro played some role, though precisely what is unknown, in the cocaine sale; the kidnapping of Estevez and Miss Campana was related to a suspicion that they had snitched on El Toro; and El Toro was indeed arrested, in June 1982, the month after the alleged sale, on information supplied by Estevez, and the retaliation took place four months later. But there is no evidence that the information that Estevez supplied, or on which Galvan, Velasquez, and (maybe) Ramon Gomez were acting when they kidnapped Estevez and Campana, was related to El Toro's participation in the sale charged in the indictment. El Toro was not indicted for that participation, and as his narcotics dealings were extensive there is no good reason to suppose that it must have been that participation which led to the retaliation against Estevez and Miss Campana. The cocaine sale and the retaliation were related only in that the appellants, plus Estevez, Miss Campana, El Toro, and others, were involved in a variety of narcotics deals, one of which was a subject of the indictment along with the retaliation against Estevez for informing about El Toro's participation in what may well have been other and unrelated narcotics dealings (like the separate torch jobs in *Lane*) in which the same people were involved.

But, normally anyway, the test for misjoinder is what the indictment charges, not what the trial shows. See Wright, Federal Practice and Procedure: Criminal 2d § 144, at pp. 520–21 (1982). Although the indictment makes no effort to tie Galvan's heroin dealings to the offenses charged against the other defendants, thus clearly violating Rule 8(b), it does allege, if not so clearly as we would like, that the retaliation was for snitching on the cocaine sale that is the subject of the first group of charges in the indictment. As there is no misjoinder on the face of the indictment of the first and third group of charges, the problem, if any, is "retroactive misjoinder."

But retroactive misjoinder is a misnomer; it is not, not often and maybe not ever, misjoinder. Rule 8 on its face is about pleading rather than proof, and there are practical reasons for maintaining the distinction. Suppose the defendants (or one or some of them) are acquitted on some counts. That surely does not establish misjoinder. See, e.g., *United States v. Turkette*, 656 F.2d 5, 8–9 (1st Cir.1981). Otherwise, every time there was a partial acquittal the defendant or defendants would be entitled to a new trial on the counts on which they had been convicted. The present case is harder since the trial revealed no evidence at all linking the cocaine dealings and the retaliation. It is not that the defendants were acquitted on some counts; as a matter of fact, except for Ramon Gomez's aiding and abetting charge, they were not acquitted, they were convicted. The point is rather that the government failed at trial to establish a link between the cocaine sale and the retribution.

Even so, most cases hold that the absence of any evidence at trial linking two sets of charges results in misjoinder only if the indictment was drawn up in bad faith— the government knew it could not prove a link between the charges at trial. See, e.g., *United States v. Kabbaby*, 672 F.2d 857, 860 (11th Cir.1982). The First Circuit, however, requires a factual basis shown at trial, as well as an absence of demonstrated bad faith, to excuse a retroactive misjoinder. See, e.g., *United States v. Arruda*, 715 F.2d 671, 678 (1st Cir.1983); *United States v. Luna*, 585 F.2d 1, 4 (1st Cir. 1978). Perhaps the conflict can be reconciled on the ground that a complete failure to prove a linkage between two or more sets of defendants could give rise to an

inference of bad faith, cf. *Brandom v. United States*, 431 F.2d 1391, 1396 (7th Cir.1970), but this we need not decide. When the trial reveals that different offenses or offenders should not as a matter of fact have been joined in one indictment, the trial judge must be "particularly sensitive to the possibility of ... prejudice." *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). See also *United States v. Warner, supra*, 690 F.2d at 554; *United States v. Jackson*, 696 F.2d 578, 585–86 (8th Cir.1982); *United States v. DeRosa*, 670 F.2d 889, 897–98 (9th Cir.1982). There was substantial prejudice from trying the cocaine and retaliation charges both with each other and with the heroin charges—the latter an example of true misjoinder.

The scanty evidence of cocaine dealings got a psychological boost from the well-substantiated heroin charges against Galvan. To the jury it may have seemed that since he was guilty of heroin dealings in June 1982, he probably was also guilty of cocaine dealings the month before—and if the jury reasoned so, this would have made Estevez's testimony about the cocaine dealings more credible and helped clinch the case against the other appellants. In addition, Galvan testified on his own behalf in an effort to rebut the heroin charges. This allowed the government to impeach him with his prior conviction for heroin violations and thus was harmful to codefendants also charged with drug violations. Clearly, the misjoinder of Galvan's heroin charges with the appellants' cocaine charges made it harder for the appellants to defend themselves on those charges.

The joint trial of the cocaine and retaliation charges was also prejudicial to the appellants. Estevez's testimony regarding retaliation was corroborated by Miss Campana but there was virtually no corroboration of his testimony about the cocaine dealings. Since a part of Estevez's testimony was corroborated, the jury may have considered the rest of his testimony more credible; yet in separate trials of the cocaine and retaliation charges, evidence of the latter could not have been used to bolster the former, since no link between the two activities was shown.

█ The government points out that the jury acquitted Ramon Gomez of aiding and abetting the retaliation against Estevez and Campana and argues that this shows that the jury made a discriminating assessment of the evidence. We disagree. The government's counsel candidly stated at argument that he had been surprised that the jury had convicted Ramon Gomez of conspiracy to retaliate, since the evidence against him was so thin. No reasonable jury could have convicted Ramon Gomez of conspiracy to retaliate on the evidence presented, and this is an indication that the jury really was confused by the tying together of essentially unrelated conspiracies. The government asked the jury to assume that Ramon Gomez knew that the reason Galvan and Velasquez had told him to hold Miss Campana was that she and Estevez had informed on the cocaine deal, but the government never substantiated the assumption. If Ramon Gomez did not know that he was participating in a scheme to retaliate against Estevez and Miss Campana for being government informants, he could not be guilty of conspiracy to retaliate. See, e.g., *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959); *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir.1982); *United States v. Rodriguez-Arevalo*, 734 F.2d 612, 615 (11th Cir.1984).

Even if there is no such animal as "retroactive misjoinder" (or at least not one in this case), it is apparent that the appellants have a strong claim that the judge should have used his authority under Rule 14 to sever the cocaine and retaliation charges for trial. The prejudice was substantial, and the offsetting economies from a joint trial virtually nil, since there were no factual links between the two sets of charges. Granted, Estevez was the main witness in both, but he could just as well have testified more briefly in two trials rather than at length in a trial that lasted three weeks. The presumption against severance rests

as we said earlier on an assumption that closely related charges are being tried together, and they were not closely related here.

But we need not decide whether the judge's failure to grant a severance under Rule 14 was reversible error. The misjoinder of the heroin charges against Galvan violated Rule 8(b) and therefore compels a new trial of all the appellants on all counts (except Ramon Gomez on the retaliation count, for we have held that he was entitled to be acquitted on that count) unless the violation was a harmless error with respect to any of the counts. The weakness of the evidence of cocaine violations, and the additional confusion engendered by the trial of the retaliation charges jointly with the cocaine charges, makes clear that the misjoinder of the heroin charges against Galvan was not harmless error as to the cocaine charges.

 But we do not think that Galvan was prejudiced at all on the heroin charges, or Galvan or Velasquez on the retaliation charges; the evidence of guilt of these offenders of these offenses was overwhelming. This is true whether their objections to being tried jointly are evaluated under Rule 8 or Rule 14. There is, however, a division among circuits over whether the doctrine of harmless error is applicable to misjoinder (Rule 8) as to other cases by virtue of Rule 52(a) of the Federal Rules of Criminal Procedure. See discussion in *United States v. Southard*, 700 F.2d 1, 19 n. 21 (1st Cir.1983). The Supreme Court has granted certiorari in the *Lane* case, cited earlier, to resolve the conflict. Our circuit has yet to take a position. The argument against application of the harmless error doctrine is that a "mass trial," not authorized by Rule 8, is so repulsive to our traditions that it ought to be nullified even if it is quite plain that the defendant was not harmed. The argument for application is that Rule 52(a) contains no exception for misjoinder and that errors in the interpretation of Rule 8 are unavoidable and not uniformly wicked or harmful. We find the latter the more convincing position.

It is true that there are criminal cases to which the doctrine of harmless error is not applied, despite the breadth of Rule 52(a). See, e.g., *Holloway v. Arkansas*, 435 U.S. 475, 487–91, 98 S.Ct. 1173, 1180–82, 55 L.Ed.2d 426 (1978). The doctrine does not allow the government to dispense with the fundamentals of adversary procedure—to refuse to allow the defendant to have the assistance of counsel, for example—merely because the defendant is clearly guilty. See *Walberg v. Israel*, 766 F.2d 1071, 1074 (7th Cir.1985). But we do not consider that precept applicable to misjoinder, unless the misjoinder reaches grotesque proportions, as it did not here; this was not a mass trial, as a trial of all tax protesters who didn't pay taxes in April 1985 would be. We therefore adopt the position of those circuits that hold that the doctrine of harmless error is normally applicable to misjoinder cases—pending, of course, authoritative resolution of the question by the Supreme Court.

 The last issue raised by these appeals, an issue of first impression at the appellate level, is whether the retaliation statute, 18 U.S.C. § 1513, a part of the Victim and Witness Protection Act of 1982, is consistent with the First Amendment, as held by Judge Weinfeld in *United States v. Wilson*, 565 F.Supp. 1416, 1429–31 (S.D.N.Y.1983). So far as pertinent here, the statute reads: "Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for ... any information relating to the commission or possible commission of a Federal offense," shall be guilty of a felony. 18 U.S.C. § 1513(a)(2). (Section 1513(a)(1) is the same, only protecting witnesses rather than informants.) The appellants who were convicted of retaliation or conspiracy to retaliate complain that the statute punishes idle threats. (Ramon Gomez's complaint, however, is moot since we have held that he was entitled to an acquittal on this charge.) No intent to carry out the threat need be shown; the only intent

required is the "intent to retaliate," which the appellants contend is vague.

The statute punishes the making of a threat to do bodily harm to or destroy or damage the property of the informant as punishment (retaliation) for his informing. Such a prohibition is not vague or overbroad. Government cannot be effective if it cannot punish people who intimidate witnesses or informants by threatening to hurt them or damage their property, and no form of words would be significantly clearer than that employed in this statute. The First Amendment is remotely if at all involved. A threat to break a person's knees or pulverize his automobile as punishment for his having given information to the government is a statement of intention rather than an idea or opinion and is not part of the marketplace of ideas.

Cases that express concern with the constitutionality of general statutes punishing threats or intimidation do so because of the potential application of such statutes to "threats" that contain ideas or advocacy, such as a "threat" to picket an organization if it does not yield to a demand to take some social or political action. See, e.g., *State v. Robertson*, 293 Ore. 402, 649 P.2d 569 (1982); *Wurtz v. Risley*, 719 F.2d 1438 (9th Cir.1983). The statute at issue in this case is not a prohibition of threats generally and hence does not exploit the ambiguity of such words as threat, intimidate, and coerce; the statute is confined to threats to retaliate forcibly against government witnesses and informants. The statute's limited scope takes it out of the realm of social or political conflict where threats to engage in behavior that may be unlawful may nevertheless be part of the marketplace of ideas, broadly conceived to embrace the rough competition that is so much a staple of political discourse. See, e.g., *Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam); *United States v. Merrill*, 746 F.2d 458, 462 (9th Cir.1984); *United States v. Lincoln*, 589 F.2d 379, 382 (8th Cir.1979); *United States v. Kelner*, 534 F.2d 1020, 1025–28 (2d Cir.1976); *United States v.*

*Ferrugia*, 604 F.Supp. 668, 674 (E.D.N.Y. 1985).

█ It also can make no difference whether the threatener intends to carry out the threat. *United States v. Merrill, supra*, 746 F.2d at 462. The argument that if there is no intent to carry through, the threat is a pure exercise in freedom of speech is purely verbal and misconceives the nature of threats. When making a threat one hopes not to have to carry it out; one hopes that the threat itself will be efficacious. Most threats, indeed, are bluffs. But if the bluff succeeds in intimidating the threatened person, or at least (as the words "intent to retaliate" require the government to show) is intended to succeed, it ought to be punished, to prevent putting government informants in fear for their personal safety or their property. And a bluff has no more to do with the marketplace of ideas than a serious threat.

We are not much troubled by the thought that, read literally, 18 U.S.C. § 1513(a)(2) might punish someone who said to informer Estevez, "you will burn in Hell for what you've done." The doctrine that comes down from *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), and that allows a person whose conduct could be punished without violating the First Amendment to challenge the statute under which he was punished by pointing to privileged conduct that the statute might be read to punish must, like all legal doctrines, not be pushed too far beyond the bounds of common sense. The chance that making threats of divine retribution unrelated to the agency of the threatener could be prosecuted successfully under section 1513 is too remote to bring the *Thornhill* doctrine into play. It is clear enough what Congress was driving at in the witness and informant intimidation statute and that it has nothing to do with literary or academic or speculative discussions of retribution or with merely vituperative advocacy. It would be impossible to draft a statute that would exclude every

hypothetical prosecution that the legal imagination can conjure up.

This conclusion is supported by cases which make clear that threats that are rhetorical rather than real are not punishable under statutes similar to section 1513, see, e.g., *Watts v. United States, supra,* 394 U.S. at 706, 89 S.Ct. at 1400 ("If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."); *United States v. Barcley,* 452 F.2d 930 (8th Cir. 1971), but do not suggest that a statute is unconstitutional if it fails to distinguish between the rhetorical and the real. With the application of the principle of *Barcley* to the facts of that case (over a vigorous dissent) one can quarrel, as with the statement of its principle in a later Sixth Circuit case: "An ambiguous letter cannot violate 18 U.S.C. § 876 [mailing threatening communications]." *Martin v. United States,* 691 F.2d 1235, 1239 (8th Cir.1982). One might have thought that the import of the letter would be a question for the jury, unless no reasonable person could interpret it as a threat—the actual holding of *Martin,* see *id.* at 1239–40. In context, the statement in the letter in that case, "But sir, you son of a bitch, I'll see you in hell before I permit you to do this to me and my son," *id.* at 1240, was not just rhetoric. In any event, the cases provide ample protection for purely verbal excess and do not require that statutes which forbid threats to injure a person or damage his property make an explicit exception for threats unlikely to be intended, or to be understood, literally.

To summarize, we affirm Galvan's heroin conviction and his and Velasquez's convictions for retaliation. We direct the acquittal of Ramon Gomez of the charge of conspiracy to retaliate. Regarding the cocaine offenses charged, we reverse the judgments of conviction of all the appellants and remand for a new trial on those charges.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.