In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-1879 & 08-1880

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AMIR HOSSEINI and HOSSEIN OBAEI,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 254—**Milton I. Shadur**, *Judge.*

ARGUED FEBRUARY 8, 2011—DECIDED MAY 7, 2012

Before SYKES, TINDER and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* Amir Hosseini and Hossein Obaei operated three automobile dealerships in Chicago, and from 1995 to 2005, sold many luxury cars to Chicago-area drug dealers. Indeed, more than half their sales during this period were to drug traffickers, who preferred to deal with Hosseini and Obaei because they were willing to accept large cash payments in small bills with no questions asked. They also falsified sales contracts

and liens, ignored federal tax-reporting requirements, and arranged their bank deposits to avoid triggering federal bank-reporting requirements. Based on this activity and more, Hosseini and Obaei were charged in a massive 100-count indictment alleging RICO conspiracy, money laundering, mail fraud, illegal transaction structuring, bank fraud, and aiding and abetting a drug conspiracy. After a five-week trial, a jury convicted on 97 counts (three were dismissed before trial), and the district court imposed long prison terms.

Hosseini and Obaei appealed, raising a host of challenges to the district court's management of the trial and the sufficiency of the government's evidence on some of the counts of conviction. Regarding the money-laundering counts in particular, they raised a legal question left open by the Supreme Court's splintered decision in *United States v. Santos*, 553 U.S. 507 (2008): In a traditional money-laundering case—where the indictment alleges that the defendant engaged in specified financial transactions for the purpose of concealing the proceeds of criminal activity or avoiding a state or federal reporting requirement (as opposed to promoting the underlying crime)—must the government prove that the laundered "proceeds" are the net profits or simply the gross receipts of the underlying crime?

That question remains unresolved in this circuit. *See United States v. Aslan*, 644 F.3d 526, 550 (7th Cir. 2011). But the defendants raised it for the first time on appeal, so we review only for plain error, and the unsettled state of the law means that the claimed error is not plain.

Moreover, there is no reason for us to ultimately decide the matter here; after the defendants' trial, Congress amended the money-laundering statute, using the broader "gross receipts" definition of "proceeds." *See* 18 U.S.C. § 1956(c)(9). Finally, because the evidence is sufficient to support the jury's verdict and the other claims of error are meritless, we affirm.

## I. Background

Hosseini and Obaei each owned a used-car dealership in Chicago, and together they owned a third. The evidence at trial established that they jointly operated all three dealerships. They frequently transferred large sums of money among the three dealerships. They bought inventory together, moved vehicles around the three car lots, referred customers to each other, and pooled their employee services, financial services, and employee benefits.

They also regularly sold expensive cars to Chicago-area drug dealers, who usually paid in cash, often in small bills—tens, twenties, and fifties rubber-banded together and carried in paper or plastic bags or shoe boxes. On the occasions when they gave their drug dealer customers in-house financing, Hosseini and Obaei did not require a credit application, proof of legitimate income, or other normal financial paperwork. They doctored sales contracts by changing purchase prices and Social Security numbers, and often used the names of straw purchasers. They routinely failed to

file the forms required by the IRS when a customer pays $10,000 or more in cash. They placed false liens on vehicles, which (among other things) allowed the dealerships to claim ownership and recover the vehicles if they were seized by law enforcement, and also enabled the drug dealers to trade in the vehicles for new cars.

Although Hosseini and Obaei frequently received large payments in cash, they arranged their bank deposits to avoid depositing more than $10,000 in cash in any single transaction, which would have triggered an obligation on the bank's part to report the cash transaction to the federal government. Prosecutors presented evidence that on at least 51 days, Hosseini and Obaei made deposits totaling more than $10,000 but divided the total among separate transactions to make sure that no single deposit exceeded the $10,000 threshold. For example, on a single day, Hosseini made six deposits of between $9,180 and $9,815 at the same bank. On another occasion he deposited $9,750 and $9,810 at the same bank in two transactions that occurred only five minutes apart. Likewise, on another day Obaei deposited a total of $14,500 in two separate transactions, 15 minutes apart, at the same bank.

This course of conduct stretched from 1995 to 2005 and involved millions of dollars in laundered drug money. In a 100-count indictment, the government charged Hosseini with RICO conspiracy, 18 U.S.C. § 1962; six money-laundering counts, 18 U.S.C. § 1956; 51 counts of structuring transactions to avoid reporting require-

ments, 31 U.S.C. § 5324; and four counts of mail fraud, 18 U.S.C. § 1341. Obaei was charged with RICO conspiracy; aiding and abetting a drug-trafficking conspiracy, 21 U.S.C. § 846; seven money-laundering counts; 30 counts of structuring; three counts of bank fraud, 18 U.S.C. § 1344; and four counts of mail fraud. Two of the money-laundering counts and one structuring count were dismissed before trial, and the jury convicted the defendants on the remaining 97 counts. Hosseini was sentenced to 240 months in prison; Obaei received a 180-month sentence. The district court also ordered all three dealerships forfeited. The defendants timely appealed.[1]

## II. Discussion

On appeal Hosseini and Obaei raise a multitude of issues, the most prominent of which concerns the meaning of "proceeds" in the money-laundering statute. They also challenge the district court's denial of their severance motion, the court's handling of voir dire, two evidentiary rulings made during the trial, and the sufficiency of the evidence on a number of counts.

---

[1] The government cross-appealed from the denial of its request to impose a $10 million forfeiture on Hosseini and Obaei, but later voluntarily dismissed that appeal.

### A. The Definition of "Proceeds" in the Money-Laundering Statute

Hosseini and Obaei first argue that to convict them of money-laundering, 18 U.S.C. § 1956(a), the government was required to prove that they engaged in the specified financial transactions for the purpose of laundering the "proceeds" of some underlying crime, and that in this context, "proceeds" means net profit of the underlying crime, not gross receipts. Their argument is styled as a challenge to the sufficiency of the evidence. They contend that the government did not prove that the auto sales in question involved the net profit of the underlying drug trafficking. They point to evidence that some of the drug dealers used the vehicles they purchased from Hosseini and Obaei in furtherance of their drug-trafficking activities. This evidence, they contend, suggests that the car payments were "business expenses," not the net profits of the drug trade.

This argument about the meaning of "proceeds" in the money-laundering statute is new on appeal. To preserve a challenge to the sufficiency of the evidence, a defendant must move for a judgment of acquittal in the trial court. *United States v. Tavarez*, 626 F.3d 902, 906 (7th Cir. 2010). Both defendants did so here; they moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure at the close of the government's case, and they renewed their motions at the close of evidence and again after the verdict. But they never raised the "proceeds" issue; instead, their

Rule 29 motions identified other grounds for acquittal. *See* FED. R. CRIM. P. 29 (stating that motions for judgment as a matter of law "must specify the judgment sought and the law and facts that entitle the movant to the judgment"). For example, they argued that selling cars to drug dealers was not evidence of a RICO enterprise or a RICO or money-laundering conspiracy. Obaei also argued that the evidence was insufficient to find him guilty of aiding and abetting a drug conspiracy.

A defendant's choice to raise specific arguments and omit others in a Rule 29 motion has consequences on appeal. We have held that when a defendant challenges the sufficiency of the evidence by motion for judgment of acquittal and makes specific arguments in support of that motion, any arguments omitted are thereby forfeited. *See United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006) (citing *United States v. Moore*, 363 F.3d 631, 637 (7th Cir. 2004) ("[W]hen . . . a [Rule 29] motion raises specific arguments, any claims not presented in the motion are waived."), *vacated on other grounds sub nom. Young v. United States*, 543 U.S. 1100 (2005)). We might alternatively construe the "proceeds" argument as a claim of instructional error. But neither defendant raised the definition of "proceeds" as a ground of objection to the jury instructions.

Accordingly, our review is only for plain error. *Aslan*, 644 F.3d at 540. "[T]o reverse for plain error, we must find (1) error (2) that is plain, and (3) that affects the defendant's substantial rights." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)). If the defendant

carries his burden on these points, the decision "whether to correct the error is discretionary; we will do so only if it seriously affected the fairness or integrity of the proceedings." *United States v. Robinson*, 663 F.3d 265, 268 (7th Cir. 2011).

The federal money-laundering statute provides in relevant part:

> (1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
>> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
>>
>> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>>
>> (B) knowing that the transaction is designed in whole or in part—
>>
>>> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>>>
>>> (ii) to avoid a transaction reporting requirement under State or Federal law,
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the

> transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a). The statute describes several different types of money laundering. Subsection (a)(1)(A)(i), the "promotion" version of the offense, requires the government to prove that the financial transaction in question was intended to promote the underlying unlawful activity. Subsections (a)(1)(B)(i) and (ii), the "concealment" and "avoidance" versions of the offense, require the government to prove that the financial transaction was "designed in whole or in part" to "conceal or disguise" the underlying crime or to "avoid a transaction reporting requirement."

All three variations of the money-laundering offense require the government to prove that the defendant "kn[ew] that the property involved in a financial transaction represent[ed] the proceeds of some form of unlawful activity." *Id.* § 1956(a)(1). At the time of this trial, the statute did not define the term "proceeds." However, in *United States v. Scialabba*, 282 F.3d 475, 475 (7th Cir. 2002), we held that "proceeds" means net profits, "at least when the crime entails voluntary, business-like operations." The defendants in *Scialabba* owned illegal video-poker machines that they displayed in bars. They were charged with running an unlawful gambling operation and also with money laundering under § 1956(a)(1)(A)(i), the "promotion" version of the offense. The latter charge, which substantially increased the defendants' prison terms, was based solely on their having "handed some of the money in the [machines'] coin boxes over to the [bars'] owners." *Id.* at 476.

Under this theory every time the defendants spent money in support of their video-poker operation, they also "promoted" the underlying crime and therefore faced money-laundering charges. We worried that this created a "merger" problem—in which the money-laundering offense merged with the predicate crime—at least when the "promotion" variation of the offense is charged. In a "promotion" money-laundering prosecution, the government is not required to prove that a defendant "hid[] or invest[ed] profits in order to evade detection, the normal understanding of money laundering." *Id.* To avoid this merger potential, and based on the rule of lenity, we held that "proceeds" denotes net rather than gross income, at least for prosecutions under § 1956(a)(1)(A)(i), the "promotion" subsection of the money-laundering statute. *Id.* at 478.

We reaffirmed *Scialabba* in *Santos v. United States*, 461 F.3d 886 (7th Cir. 2006). The Supreme Court granted certiorari in *Santos* to resolve a circuit split on the "proceeds" question, but no opinion commanded a majority of the Court. Four justices held that "proceeds" always means net profits. *United States v. Santos*, 553 U.S. 507, 509 (2008) (plurality opinion). Four held that "proceeds" always means gross revenues. *Id.* at 531 (Alito, J., dissenting). Justice Stevens wrote separately, suggesting that the meaning of the term could vary depending on the type of conduct at issue and the penalties involved. *Id.* at 524 (Stevens, J., concurring in the judgment). Under the circumstances in *Santos*, he agreed with the plurality that "proceeds" meant net profits. *Id.* at 528.

We have addressed the split opinions in *Santos* in three cases. *See Aslan*, 644 F.3d at 541-50; *United States v. Lee*, 558 F.3d 638 (7th Cir. 2009); *United States v. Hodge*, 558 F.3d 630, 633 (7th Cir. 2009). Two of these, however—like *Santos* itself—involved prosecutions for "promotion" money laundering. *See Lee*, 558 F.3d at 640; *Hodge*, 558 F.3d at 633-34. In *Aslan* we addressed the "proceeds" question in the context of a prosecution for "concealment" money laundering. 644 F.3d at 541-50. We noted that the merger problem dissipates when the government alleges that the defendant specifically entered into a transaction to conceal the source or nature of ill-gotten gains. *Id.* at 545-46. We suggested in *Aslan* that proof of net profits in a *concealment* prosecution is not necessary to prevent the money-laundering offense from merging into the underlying crime. *Id.*

We did not ultimately resolve the question, however, because in *Aslan*, as here, we were reviewing only for plain error. It was enough to note that "[t]he fractured Supreme Court opinion [in *Santos*] addressed only promotional and not concealment money laundering[,]" and even in that context, a majority of the Court could not decide whether proof of net profits is *always* required. *Id.* at 550. More importantly, because none of our post-*Santos* cases had addressed the meaning of "proceeds" in a "concealment" money-laundering prosecution, we held that "[t]he law remains unsettled and the error is therefore not plain." *Id.* at 547-48. We also noted that Congress had since amended the money-laundering statute in response to the Supreme Court's decision

in *Santos*, adopting the broader "gross receipts" definition of the term "proceeds."[2] *Id.* at 549.

Our decision in *Aslan* controls here. Hosseini and Obaei were convicted of concealment money laundering—and also the transaction-avoidance form of the offense—but they failed to preserve the "proceeds" issue in the district court. At the time of their trial, it was unclear whether proof of "proceeds" in a concealment or avoidance money-laundering prosecution required proof that the defendant laundered net profits of the underlying criminal activity. Accordingly, as in *Aslan*, the claimed error—if there was one—was not plain.

## B. Misjoinder/Severance

Hosseini asked the district court for severance of the drug-conspiracy count, which was lodged against Obaei alone. The district court denied the request, holding that joinder was proper under Rule 8 of the Federal Rules of Criminal Procedure. We review claims of misjoinder de novo based on the allegations on the face of the indictment, not the proofs at trial.[3] *United States v.*

---

[2] *See* 18 U.S.C. § 1956(c)(9) ("[T]he term 'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.").

[3] Relief from prejudicial joinder is governed by Rule 14 of the Federal Rules of Criminal Procedure. Hosseini focused his

(continued...)

*Williams*, 553 F.3d 1073, 1078 (7th Cir. 2009). Joinder rules are applied broadly in order to promote efficiency; joint trials are more convenient for witnesses, foster speedier trials, and allow a single jury to hear the "total story." *United States v. Stillo*, 57 F.3d 553, 556-57 (7th Cir. 1995).

Rule 8(b) of the Federal Rules of Criminal Procedure governs joinder of multiple defendants in a single indictment:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

FED. R. CRIM. P. 8(b). If the offenses arise out of "the same series of acts or transactions," joinder is appropriate. Even if misjoinder has occurred, however, we will grant a new trial only if the misjoinder "had substantial or injurious effect or influence in determining the jury's verdict." *Stillo*, 57 F.3d at 557 (quotation marks omitted).

Hosseini emphasizes that only Obaei was charged in the drug-conspiracy count, but that's not enough to

---

[3] (...continued) argument on the Rule 8 joinder standard, making only passing reference to Rule 14.

establish misjoinder. Rule 8(b) specifically provides that "[a]ll defendants need not be charged in each count." The relevant question is whether the acts or transactions underlying the drug-conspiracy count are part of the same "series of acts or transactions" as the other counts in the indictment.

That standard is easily met here. The allegations underlying the drug-trafficking conspiracy were part and parcel of the course of conduct alleged in the RICO and money-laundering counts. The government's theory on the drug-conspiracy count was that Obaei aided and abetted an international drug-distribution conspiracy primarily by placing false liens on vehicles that were actually paid in full in cash by the drug dealers. The indictment alleged that one purpose of the false liens was to provide the appearance of legitimacy in the event that law-enforcement officers seized the vehicles, as well as an arguable basis to recover the vehicles:

> It was further part of the conspiracy that defendant OBAEI fraudulently maintained liens on the majority of the approximately 20 vehicles sold to Carlos Velazquez-Salgado and members of his narcotics trafficking organization in order to assist [him] in retrieving those vehicles from federal or local law enforcement in the event those vehicles were seized. Defendant OBAEI maintained these liens even though the vehicles had been paid for in full with cash and [the dealership] did not hold a legitimate security interest in the vehicles.
>
> . . . .

. . . After the vehicle was seized, defendant OBAEI attempted to make arrangements to retrieve the vehicle for Co-conspirator F, a member of Carlos Velazquez-Salgado's drug trafficking organization.

The false-lien allegations thus substantially overlap with the factual basis for the RICO and money-laundering conspiracy charges. The indictment alleged that once the vehicles were seized, Hosseini and Obaei, as part of the RICO conspiracy, attempted to retrieve the vehicles:

It was part of the scheme that defendants HOSSEINI and OBAEI fraudulently placed liens on automobiles sold to narcotics traffickers and gang members involved in drug trafficking . . . and paid for in full at the time of purchase, which liens falsely indicated that the affiliated entities held security interests in (or innocent ownership claim to) automobiles sold by the [dealerships] to these drug dealers and/or gang members.

It was further part of the scheme that, if one of the automobiles sold by the [dealerships], upon which a fraudulent lien was placed, was seized by the Chicago Police Department or a federal law enforcement agency following narcotics transactions or other criminal activity subjecting the automobile to forfeiture, defendants HOSSEINI and OBAEI . . . would then falsely claim a security or ownership interest in the seized automobile to prevent forfeiture of the motor vehicle.

The drug-conspiracy allegations thus arose out of the same series of acts or transactions as the other counts in

the indictment. Hosseini relies on *United States v. Velasquez*, 772 F.2d 1348 (7th Cir. 1985), as support for his misjoinder argument, but this reliance is misplaced. In *Velasquez* the government charged five defendants with trafficking in cocaine. One of the defendants was also charged with heroin distribution in a completely unrelated scheme. We held that joinder was improper. *Id.* at 1353. Here, in contrast, the conduct forming the factual basis for the drug-conspiracy charge against Obaei is part of the same series of acts and transactions as the RICO-conspiracy and money-laundering charges against both defendants. The severance motion was properly denied.

## C. Voir Dire

Hosseini and Obaei also challenge the district court's refusal to individually question prospective jurors about possible racial, ethnic, or religious prejudices. Our review is for abuse of discretion. *Hollins v. City of Milwaukee*, 574 F.3d 822, 828 (7th Cir. 2009). Jury selection is "particularly within the province of the trial judge," and "[n]o hard-and-fast formula dictates the necessary depth or breadth of voir dire." *Skilling v. United States*, 130 S. Ct. 2896, 2917 (2010).

The defendants asked the judge to question potential jurors about bias against Iranian-Americans. The judge agreed and posed the following question to the entire venire:

> One of the jury instructions that's given in every criminal case, and that will of course be given

in this run reads this way in part[:] "Do not allow sympathy, prejudice, fear or public opinion to influence you. You should not be influenced by any person's race, color, religion, national ancestry or sex"—both defendants here are Iranian-American citizens, will any of you have any difficulty in following that instruction as to the ethnicity, national origin of these defendants rather than deciding this case solely on the basis of the evidence that's presented to you? Anybody have any problem with that[?]

One juror raised her hand and told the court in a sidebar that she thought Muslims were "a huge threat" and was "scared of them." Questioned further, the juror said that she had not shared this view with other jurors. She was dismissed for cause.

The dismissed juror's replacement quickly informed the court that he "might have the same problem as that other young lady had." Another sidebar was called, and the prospective juror told the court that he had "a problem with people that weren't born in this country." He was excused as well. Soon thereafter, the defendants asked the judge to individually question every member of the venire on the issue of the defendants' national origin and religion. The judge refused:

I am not going to do it. I was very careful to pose a question in the kind of generic way that I think is appropriate. And the one thing that we don't want to have[] is something that by questioning creates a

suggestion. And we count on jurors to be candid
and open with us. It's been demonstrated by the
fact that that woman who had bias, an obvious bias,
was troubled and was forthright about that. So
I don't see any reason to believe that because other
people listened to the question that I posed as you
heard very carefully, didn't respond, calls then for . . .
individualized voir dire. Because what that basically
does is to heighten the problem instead of easing
a problem.

The judge also said that individualized voir dire could
"have much more adverse fallout than favorable fall-
out." The judge concluded that putting the question
of bias to the jurors as a group was sufficient to
identify any jurors for whom follow-up individualized
questioning might be necessary.

Where racial or ethnic bias may be an issue in a case
and the defendant requests voir dire on the subject, it is
an abuse of discretion to refuse the request. *Ham v. South
Carolina*, 409 U.S. 524, 526-27 (1973); *United States v.
Booker*, 480 F.2d 1310, 1311 (7th Cir. 1973). Here, however,
the district court did not *refuse* to question the potential
jurors about possible bias. Rather, the judge put the
question generally to the jury venire and continued with
individual inquiry only when specifically warranted.

This was an entirely reasonable contextual judgment
by an experienced trial judge, and we see no basis to
upset it. The district court has broad discretion over
the form and conduct of voir dire, which includes
deciding whether to question potential jurors about

relevant matter individually or as a group. *United States v. Perez-Gonzalez*, 445 F.3d 39, 46 (1st Cir. 2006); *United States v. Guy*, 924 F.2d 702, 708 (7th Cir. 1991). Individual voir dire of all prospective jurors may be called for in limited circumstances—for example, where extensive pretrial publicity increases the likelihood that jurors have formed preconceived notions about a case, *see, e.g.*, *Skilling*, 130 S. Ct. at 2919; *United States v. Dellinger*, 472 F.2d 340, 374 (7th Cir. 1972), or where pervasive inappropriate discussions occur during the course of jury selection, *see, e.g.*, *United States v. Blitch*, 622 F.3d 658, 665-67 (7th Cir. 2010). But ordinarily, questioning jurors as a group is sufficient to satisfy the Sixth Amendment, even when the defendant belongs to a racial, ethnic, or religious minority and juror bias on one or more of these grounds might be a concern. *Guy*, 924 F.2d at 708; *United States v. Dixon*, 596 F.2d 178, 182 (7th Cir. 1979).

*Dixon* is representative. There, the defendant, a black man who spoke with a marked dialect, sought individualized voir dire about the racial prejudices of the jurors, but the trial court refused, opting instead to address a series of questions about racial bias to the venire and then conduct follow-up individual questioning with any juror who answered in the affirmative. We held that the Sixth Amendment does not demand any "particular pattern of inquiry" and observed that "an appellate court must rely considerably on the judgment of the trial judge in deciding on the nature and extent of the inquiry reasonably required." *Dixon*, 596 F.2d at 182. Here too, we defer to the judgment of the trial judge. His reasoning was sound.

**D.  Trial Evidence**

Hosseini challenges two of the district court's eviden-
tiary decisions. First, he argues that the district court
erroneously precluded him from submitting evidence
to show that he sometimes complied with federal
transaction-reporting requirements by filing IRS Form
8300. This evidence, he contends, would have shown
that his failure to file on the occasions charged in the
indictment was unintentional. Second, he argues that he
was wrongly precluded from calling his accountant to
testify. He claims that his accountant advised him
that banks aggregate multiple daily deposits to deter-
mine their obligation to report them to the IRS. This ad-
vice, he argues, would have provided a plausible inno-
cent explanation for his pattern of multiple daily deposits.

We review evidentiary rulings for abuse of discretion.
*United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010).
The district court excluded both categories of evidence
after weighing the probative value of the evidence
against the possibility of prejudice, confusion, cumula-
tion, or delay, as specified in Rule 403 of the Federal
Rules of Evidence. "We give special deference to
the district court's assessment of the balance between
probative value and prejudice because that court is in
the best position to make such assessments." *United
States v. Hale*, 448 F.3d 971, 985 (7th Cir. 2006). We will
find error only "if no reasonable person could agree
with the ruling." *Gorman*, 613 F.3d at 720 (quotation
marks omitted). And even if the district court erred,
we will reverse only if the error influenced the jury's

ultimate decision. *United States v. Borrasi*, 639 F.3d 774, 778 (7th Cir. 2011).

**1.  *IRS Form 8300***

Some of the charges against Hosseini were based on his repeated failure to file the required IRS Form 8300 when the dealerships received more than $10,000 in cash from a single customer. Form 8300 requires several pieces of information, including the buyer's name, address, Social Security number, and type of identification used when consummating the transaction. The government argued that Hosseini repeatedly and intentionally failed to file the forms to conceal the true nature and source of the purchase money involved in the transactions with drug dealers.

But Hosseini filed Form 8300 in *some* transactions, and he sought to introduce evidence of 315 of these forms as proof that he did not intentionally violate the reporting requirement on the occasions charged by the government. The government moved to exclude this evidence, and the district court granted the motion, concluding that its probative value was substantially outweighed by the risk of confusing the issues, misleading the jury, and creating myriad collateral inquiries into the authenticity of the forms and the facts of the underlying transactions.

Assuming the forms were marginally relevant to Hosseini's "innocent mistake" theory of defense, this evidence remains subject to Rule 403, and we see no

reason to second-guess the district court's judgment on this point. The judge was validly concerned about the possibility of confusing the issues, misleading the jury, and especially wasting time on mini-trials about the provenance of the forms. The district court did not abuse its broad discretion in excluding this evidence.

**2.** *Accountant's Testimony*

The structuring charges were based on the defendants' frequent practice of making bank deposits of more than $10,000 in a single day but in amounts just below the $10,000 threshold that triggers the bank's federal reporting requirement. Hosseini claimed that his accountant told him that banks aggregate daily deposits from a single source to determine whether they need to file the IRS report. That advice, taken at face value, tended to support Hosseini's claim that the pattern of same-day deposits had an innocent explanation.

The government moved to exclude the accountant's testimony. The judge granted the motion, giving three reasons for his decision. First, the judge held that the accountant's testimony was cumulative because Hosseini introduced similar testimony from an employee at one of the banks with which he did business. Second, the accountant himself made several of the questionable deposits on Hosseini's behalf, making him a potential coconspirator and thus creating distracting side issues about the accountant's own culpability. Third, the court held that Hosseini's reliance on the accountant's advice (if indeed he did rely on it) was unjusti-

fied because the accountant was not an expert in banking-industry practices.

Hosseini attacks the first and third reasons on appeal. He insists that the accountant's testimony was not cumulative because the bank employee would testify only to conversations with Hosseini about deposits in one specific bank, while the accountant could have testified about banking practices more broadly. He also maintains that whether he justifiably relied on the accountant's advice was a matter for cross-examination and had no bearing on the admissibility of the testimony.

Perhaps Hosseini is right that the reliance issue was not a reason to exclude the evidence but, rather, could have been explored on cross-examination. Still, the other reasons for excluding the accountant's testimony were sound. There was considerable overlap between his testimony and that of the bank employee. And the judge's concern about getting sidetracked by the testimony of a potential coconspirator is entitled to deference. The accountant would have been cross-examined about his own conduct and what he knew about the defendants' activities. This would have unduly complicated an already complex five-week trial.

### E.  Sufficiency of the Evidence

Finally, Hosseini and Obaei contend that the evidence was insufficient on certain counts of conviction. Both defendants challenge their RICO-conspiracy convictions, claiming that at best the evidence established

only parallel conduct, not a criminal enterprise. In addition, Hosseini challenges the sufficiency of the evidence on three of his money-laundering convictions. Finally, Obaei argues that the evidence was insufficient to convict him of aiding and abetting a drug conspiracy. On all these claims, the defendants face an extremely difficult burden. We view the evidence in the light most favorable to the verdict and reverse only if no reasonable jury could have found the defendants guilty beyond a reasonable doubt. *United States v. Shamah*, 624 F.3d 449, 453 (7th Cir. 2010).

### 1. *RICO*

The defendants argue that the evidence was insufficient to prove the existence of a racketeering "enterprise," a required element of any RICO charge. The RICO statute defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and *any union or group of individuals associated in fact although not a legal entity*." 18 U.S.C. § 1961(4) (emphasis added). The Supreme Court reads this definition quite broadly. *See Boyle v. United States*, 556 U.S. 938, 944-45 (2009). In *Boyle* the Court held that an "association-in-fact enterprise" has just three elements: "a purpose," "relationships among those associated with the enterprise," and "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946; *see also Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2011) ("[T]he alleged enterprise in this case had purpose and relationships and it certainly had 'longevity,' and if *Boyle* is taken at face value[,] nothing

more is required to make a conspiracy a RICO enterprise.").

The defendants seize on the following language from a footnote in *Boyle*:

> It is easy to envision situations in which proof that individuals engaged in a pattern of racketeering activity would not establish the existence of an enterprise. For example, suppose that several individuals, *independently and without coordination*, engaged in a pattern of crimes listed as RICO predicates—for example, bribery or extortion. Proof of these patterns would not be enough to show that the individuals were members of an enterprise.

556 U.S. at 947 n.4 (emphasis added). But here, the defendants' course of conduct, viewed in the light most favorable to the verdict, was neither independent nor lacking in coordination. Together the defendants operated three auto dealerships, sharing bank accounts, health insurance, and employees. They transferred money back and forth with some frequency, referred customers to each other's lots, and sold vehicles to known drug dealers in exactly the same manner.

This evidence was easily sufficient to permit a reasonable jury to conclude that the alleged RICO enterprise had a purpose (profiting through unreported cash auto sales to drug dealers), relationships (Hosseini and Obaei's own close personal relationship, as well as the dealerships' interlocking relationship), and longevity (the scheme lasted at least a decade). Under *Boyle* the

evidence was easily sufficient to establish a RICO enter-
prise.[4]

### 2. *Substantive Money-Laundering Offenses*

Hosseini challenges the sufficiency of the evidence
on three of the substantive money-laundering counts.
Count 4 centered on the sale of a car to an undercover
officer posing as a drug dealer. The government alleged
that Hosseini entered into this transaction with the
same intent as the transactions with actual drug dealers:
to conceal the proceeds of drug trafficking. *See* 18 U.S.C.
§ 1956(a)(3)(B). Hosseini argues that the government
failed to prove his intent to conceal. He claims that al-
though he told the officer that he would not file a
Form 8300 in connection with this transaction, he in
fact did so. Furthermore, while the officer mentioned
"dope money" during the transaction, he never specif-
ically said that the purchase money was drug money.

Compared to the other money-laundering counts, the
evidence on Count 4 was not particularly plentiful. Still,
there was enough for the jury to infer that Hosseini en-
gaged in this particular transaction with the same intent
as all the others: to conceal the fact that the purchase
money was drug money. First, the undercover officer

---

[4] The defendants argue in passing that the evidence was
insufficient to prove the existence of a RICO or money-launder-
ing conspiracy. This argument is underdeveloped and there-
fore waived. *See United States v. Adams*, 625 F.3d 371, 378 (7th
Cir. 2010).

told Hosseini that his name was "John Russell" but told Hosseini to use the name "Russell John" to avoid paperwork in his real name; Hosseini complied. Second, Hosseini omitted a Social Security number and driver's license number from the sales contract and did not indicate that payment—$16,000—was in cash. Finally, that the officer used the phrase "dope money" during the encounter is telling; no one would expect a drug dealer to specifically say that the purchase money was drug money. Finally, while it's true that Hosseini filed a Form 8300 for this transaction, he did not include a Social Security number as required. Based on this evidence, and particularly in light of the extended course of money laundering by the defendants, a rational jury could have concluded beyond a reasonable doubt that Hosseini acted with intent to conceal laundered funds. *See United States v. Kaufmann*, 985 F.2d 884, 894 (7th Cir. 1993).

Counts 10 and 11 were based on two auto sales Obaei entered into on the same day; Hosseini was involved in these transactions only after the fact. As to these two sales, the government presented the following evidence: (1) Obaei collected the cash proceeds of the sales and placed them in a bag; (2) later that day Obaei gave the bag to Hosseini (this was captured on videotape); and (3) when one of Obaei's employees asked to borrow money later that day, Obaei responded that he gave all his cash to Hosseini.

If this evidence stood alone, it might be hard to conclude that it was enough to infer Hosseini's knowledge and intent. But it does not stand alone. When the

evidence on Counts 10 and 11 is considered against the backdrop of the entire pattern of conduct—millions of dollars in cash auto sales to drug dealers over the course of a decade—the jury could reasonably infer that Hosseini knowingly and intentionally participated in these sales with intent to conceal laundered funds.

We note in the alternative that the jury was instructed on the *Pinkerton* theory of liability, and this provides an alternative basis to uphold Hosseini's convictions on these counts. *See Pinkerton v. United States*, 328 U.S. 640 (1947). Under *Pinkerton* "a defendant may be found guilty of a substantive offense committed by a co-conspirator if the offense was committed in furtherance of the conspiracy at the time the defendant was a member of the conspiracy." *United States v. Pisman*, 443 F.3d 912, 913 (7th Cir. 2006). This is true "even if the defendant neither participated in *nor had knowledge of the substantive offense*." *Id.* (emphasis added). Here, the jury found both defendants guilty of conspiracy to launder the proceeds of drug trafficking. When Obaei entered into the two transactions charged in Counts 10 and 11, he committed a foreseeable act in furtherance of that conspiracy. Under *Pinkerton* Hosseini is liable for the crime *even if* he was unaware of the specifics of the transactions, however unlikely that may be.

### 3. *Drug-Trafficking Conspiracy*

Finally, Obaei challenges his conviction for aiding and abetting the underlying drug-trafficking conspiracy. To convict on this charge, the government needed to prove

that Obaei knew of the conspiracy, intended to further its success, and committed at least one act of affirmative assistance. *United States v. Irwin*, 149 F.3d 565, 570 (7th Cir. 1998). Obaei argues that the evidence was insufficient to establish that he knew of the drug-trafficking conspiracy; rather, he claims that this conviction was based on an impermissible piling up of inferences. On this record, Obaei's argument strikes us as completely implausible.

Obaei emphasizes that he never bought, sold, possessed, or stored drugs for the customers of his auto dealerships. That he did not himself possess or sell drugs does not undermine the conspiracy conviction. The evidence on this count established that one of Obaei's customers was a high-ranking drug dealer who purchased 20 vehicles during a six-month period paying in cash in a total amount exceeding $1 million. Obaei placed false liens on these vehicles because he knew they might be seized by law enforcement. As the putative lien holder, he provided the purchaser with a letter giving permission for the vehicles to cross the border into Mexico in an attempt to provide the cover of legitimacy for the border crossing. And Obaei agreed to—and indeed later attempted to—retrieve the vehicles seized by law enforcement. Viewed in the light most favorable to the verdict, the evidence was easily sufficient to convict Obaei of aiding and abetting a drug-distribution conspiracy.

AFFIRMED.